EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Eduardo Cora Colón<br><br>Peticionario<br><br>v.<br><br>Grupo Ferrer Rangel<br><br>Recurrido | Certiorari<br><br>2026 TSPR 58<br><br>218 DPR ___ |

Número del Caso: CC-2024-0610

Fecha: 3 de junio de 2026

Tribunal de Apelaciones:

    Panel Especial

Representante legal de la parte peticionaria:

    Lcda. Tanaira Padilla Rodríguez

Representantes legales de la parte recurrida:

    Lcdo. Roberto Cámara Fuertes
    Lcda. Suleicka Tulier Vázquez

Materia: Responsabilidad Civil Extracontractual – Contornos de la libertad de prensa frente a una acción de difamación de una figura privada; evidencia circunstancial para sustentar inferencias razonables sobre el daño a la reputación si se ha probado la falsedad de lo publicado y la negligencia del demandado.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Eduardo Cora Colón

    Peticionario

        v.

Grupo Ferrer Rangel                                  CC-2024-0610

    Recurrido


Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES


En San Juan, Puerto Rico, a 3 de junio de 2026.

La democracia descansa sobre garantías constitucionales que amparan la libertad de palabra y, en lo aquí relevante, de prensa. Esa libertad, sin embargo, coexiste con el interés de proteger la reputación e integridad de las personas ante la difusión culposa de información falsa e intrínsecamente lesiva. Esta tensión nos plantea la tarea ardua de escudar el debate público sin sacrificar la reputación y dignidad individual.

En ese equilibrio, la controversia ante nuestra consideración exige examinar los contornos de la libertad de prensa frente a una acción de difamación de una figura privada. En este caso, el peticionario

fue objeto de atribuciones falsas relacionadas con la declaración de culpabilidad por un delito grave. La imputación falsa se publicó en plataformas digitales de un periódico de circulación general. Las publicaciones permanecieron inalteradas por casi una década, a pesar de haberse pedido su rectificación e, incluso, luego de haberse celebrado el juicio en su fondo en la causa de epígrafe.

En ese contexto, debemos precisar el estándar probatorio aplicable al elemento de daños y el alcance de la prueba circunstancial en una acción de difamación, así como las inferencias razonables que pueden derivarse de dicha prueba, particularmente cuando la difusión ocurre a través de medios digitales de amplio alcance.

Adelantamos que nuestro ordenamiento jurídico reconoce que la evidencia circunstancial, apreciada a la luz de la experiencia común, puede sustentar inferencias razonables sobre el daño a la reputación si se ha probado la falsedad de lo publicado y la negligencia del demandado. Lo que no se permite, en protección de la libertad de prensa, es la imposición de responsabilidad objetiva, la aplicación de presunciones automáticas sobre el elemento del daño o la concesión de daños punitivos.

Las libertades no son inmunidades. Así como la protección de la reputación personal no puede desembocar en la censura, la libertad de prensa no debe convertirse en una barrera infranqueable que cobije el ataque injustificado a la honra individual.

I

El 18 de mayo de 2017, el Sr. Eduardo Cora Colón (señor Cora Colón) y su esposa, la Sra. María de los Ángeles Hernández Viera (señora Hernández Viera), presentaron una demanda por difamación y daños y perjuicios contra GFR Media, LLC., propietaria de *El Nuevo Día* *(en conjunto, GFR)*. Posteriormente, el 9 de abril de 2018, el señor Cora Colón y la señora Hernández Viera, presentaron una *Segunda Demanda Enmendada*. Surge de esta, que el 1 y 6 de julio de 2015, y sucesivamente el 23 de mayo de 2016, el periódico *El Nuevo Día* publicó que el señor Cora Colón figuraba como coacusado en un caso de fraude bancario en el Tribunal Federal para el Distrito de Puerto Rico. Asimismo, publicó que el señor Cora Colón, junto con otros imputados, había llegado a un acuerdo con el gobierno federal, por lo que hizo alegación de culpabilidad. Se publicó lo anterior, a pesar de que los cargos en su contra se desestimaron en noviembre de 2014 a petición de la fiscalía federal.

En lo medular, el señor Cora Colón alegó que estas publicaciones eran falsas y que el periódico las divulgó negligentemente, pues se trataba de información oficial de fácil corroboración. Además, sostuvo que la periodista que redactó las notas reportó el caso desde su etapa inicial, por lo que tenía conocimiento de primera mano y podía constatar en el expediente federal que los cargos se habían retirado. Añadió que la información errónea vulneró su intimidad, reputación e

imagen. Por esos mismos hechos, su esposa reclamó que sufrió angustias emocionales.

Cabe destacar que, tras la publicación, el representante legal del señor Cora Colón se comunicó formalmente con GFR en mayo de 2016 para advertir sobre la inexactitud de la información publicada. En su comunicación, notificó que la información publicada era falsa porque los cargos federales contra su cliente se habían desestimado previamente, a solicitud de la fiscalía federal. Por ello, solicitó que el periódico rectificara la información difundida. A pesar de ese aviso, el periódico no publicó rectificación alguna y mantuvo la noticia en internet.

Luego de varios trámites procesales, se celebró el juicio en su fondo los días 20 y 21 de junio de 2023. En el juicio, testificaron el señor Cora Colón, su esposa y su abogado. Por parte de GFR, declaró la periodista autora de las notas y se presentó la deposición de un supervisor laboral del señor Cora Colón.

En su testimonio, el señor Cora Colón describió el impacto personal y profesional que, a su juicio, tuvieron las publicaciones. Expresó que se sintió avergonzado y frustrado al verse asociado públicamente con un delito grave que no enfrentaba. Indicó que personas de su entorno laboral y social le hicieron comentarios relacionados con las noticias publicadas, lo que le provocó preocupación. Manifestó que algunos conocidos creyeron que en efecto se había declarado culpable y que, incluso, en una ocasión una vecina le preguntó cómo estaba manejando su probatoria.

Durante el juicio, el abogado del señor Cora Colón explicó el estado procesal del caso federal y confirmó que los cargos se habían desestimado antes de las publicaciones impugnadas. Por parte de GFR, la autora de las notas esclareció el proceso seguido para la redacción de las noticias y las fuentes utilizadas. Asimismo, en la deposición presentada por GFR, el supervisor laboral del señor Cora Colón indicó que este continuó empleado y que no tuvo conocimiento de consecuencias laborales adversas atribuibles a las publicaciones.

El 11 de septiembre de 2023, el Tribunal de Primera Instancia notificó una sentencia en la cual determinó que las noticias eran falsas y que hubo negligencia por parte del medio de comunicación, pero razonó, además, que el señor Cora Colón no presentó prueba suficiente sobre daños reales a su reputación o sufrimiento emocional. En específico, el foro primario enfatizó que la prueba sobre daños se limitó al testimonio de los demandantes y entendió que no se acreditaron daños concretos, medibles o verificables a causa de las publicaciones. En consecuencia, desestimó la reclamación.

En cuanto a la señora Hernández Viera, el Tribunal de Primera Instancia reconoció que ella declaró que sufrió ansiedad, tristeza, angustia y coraje como consecuencia de las publicaciones. Sin embargo, a pesar de que le brindó credibilidad al testimonio de la señora Hernández Viera y a la existencia de daños, concluyó que su reclamación dependía de que prosperara la acción principal de su esposo y, consecuentemente, desestimó su causa.

Inconforme, el 7 de diciembre de 2023 el señor Cora Colón apeló la sentencia. En síntesis, alegó que el Tribunal de Primera Instancia erró al no reconocer el daño moral y el daño causado a su reputación. También alegó que el foro primario erró al desestimar la reclamación de la señora Hernández Viera, a pesar de concluir que ella probó los elementos de su causa de acción, incluyendo las angustias mentales.

El 30 de agosto de 2024, el Tribunal de Apelaciones emitió una sentencia en la que confirmó el dictamen del foro primario. El foro apelativo se rehusó a interferir con las determinaciones de hechos realizadas por el Tribunal de Primera Instancia y razonó que no se presentó prueba clara, robusta y convincente de que el señor Cora Colón sufrió daños reales a causa de la publicación difamatoria.

Entonces, el 4 de octubre de 2024 el señor Cora Colón presentó ante esta Curia una petición de *certiorari*. Señala que el Tribunal de Apelaciones cometió los errores siguientes: (1) mantuvo las determinaciones de hechos del foro primario; (2) determinó que no se probó daño real; (3) se negó a concluir que la actuación de GFR no solo fue negligente, sino que constituyó malicia real, y (4) confirmó que, aunque se probó que la señora Hernández Viera sufrió daños, procedía desestimar su reclamación por haberse desestimado la acción principal contra el señor Cora Colón.

Expedido el auto de *certiorari* y tras la comparecencia de las partes, procedemos a resolver, no sin antes desglosar el derecho aplicable.

II

**_A. El derecho a la libertad de expresión y la difamación_**

La Constitución de Puerto Rico establece de forma expresa que "[t]oda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar". Art. II, Sec. 8, Const. PR, LPRA, Tomo 1, pág. 328. Esta cláusula constitucional es tradicionalmente reconocida por refrendar el derecho a la intimidad. Sin embargo, también dimana de ella una garantía en contra de la difamación.

Se entiende por difamación el acto de "desacreditar a una persona publicando cosas contra su reputación". Pérez v. El Vocero de P.R., 149 DPR 427, 441 (1999), citando a I. Rivera García, _Diccionario de Términos Jurídicos_, New Hampshire, Equity Publishing Corp., 1985. La difamación puede manifestarse en dos modalidades: el libelo y la calumnia. Íd. El libelo ocurre cuando el ataque a la reputación proviene de publicaciones escritas o de un "expediente permanente de la expresión difamatoria". Íd. En cambio, la calumnia "se configura con la mera expresión oral difamatoria". Íd.

En ambas modalidades, el bien jurídico protegido es la reputación del individuo agraviado. La reputación incluye el interés legítimo en salvaguardar sus relaciones presentes con terceros, su capacidad para entablar relaciones futuras, su imagen pública y la prevención de percepciones injustamente negativas. Véanse, Soc. de Gananciales v. El Vocero de P.R., 135 DPR 122, 126-127 (1994); D. A. Anderson, _Reputation,_

*Compensation, and Proof*, 25 Wm. & Mary L.Rev. 747, 765-766 (1984).

En Puerto Rico, la Ley de Libelo y Calumnia de 1902, 32 LPRA sec. 3141 *et seq.*, fue la primera fuente de derecho en canalizar acciones civiles en contra de la difamación. En 1952 la Constitución de Puerto Rico desplazó la Ley de Libelo y Calumnia, por lo que la ley especial subsiste como referencia supletoria. Méndez Arocho v. El Vocero de P.R., 130 DPR 867, 876 (1992); Cortés Portalatín v. Hau Colón, 103 DPR 734, 738 (1975). Al respecto, ya este Tribunal resolvió que "desde la aprobación de la Constitución del Estado Libre Asociado de Puerto Rico, nuestra Ley de Libelo y Calumnia ha perdido gran parte de su importancia y que los casos relacionados con este tema se resolverán, como regla general, bajo la normativa de los daños y perjuicios extracontractuales […]". Ojeda v. El Vocero de P.R., 137 DPR 315, 328 (1994).

Actualmente la acción por difamación se considera una reclamación torticera general que incluye, sin distinción material, tanto el libelo como la calumnia. Íd., pág. 325. A su vez, la causa de acción extracontractual del Código Civil permite que la parte agraviada tenga acceso a resarcimiento por el daño a su reputación, así como por otros daños resultantes de la difamación, como las angustias mentales y las pérdidas económicas. Soc. de Gananciales v. El Vocero de P.R., supra, pág. 128.

En los casos de difamación "se enfrentan dos derechos constitucionales de la más alta jerarquía en nuestro ordenamiento, a saber, el derecho a la libertad de expresión

y de prensa, y el derecho a la intimidad. En consecuencia, estos casos requieren que el juzgador haga un delicado balance de intereses". Pérez v. El Vocero de P.R., supra, págs. 441-442.

El derecho a la libertad de expresión y prensa encuentra su origen en los postulados de la Primera Enmienda de la Constitución de Estados Unidos. Izquierdo II v. Cruz y otros, 213 DPR 607, 619-620 (2024). En síntesis, esta garantía constitucional prohíbe que el estado adopte leyes que coarten la libertad de palabra y de prensa. Enmda. I, Const. EE. UU., LPRA, Tomo 1. Además, por tratarse de un derecho fundamental, esta protección a la libertad de expresión y prensa rige plenamente en nuestra jurisdicción. Izquierdo II v. Cruz y otros, supra, pág. 620.

Desde sus inicios, el Tribunal Supremo federal ha reconocido que la Primera Enmienda garantiza la libertad de expresión especialmente cuando la expresión versa sobre asuntos de interés público. New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964). Asimismo, el Máximo Foro federal ha establecido que esta garantía constitucional persigue propiciar un intercambio de información libre, robusto y abierto al debate público. Íd., pág. 270.

Precisamente, en New York Times Co. v. Sullivan, el Tribunal Supremo federal evaluó si una expresión pierde la protección que emana de la Primera Enmienda cuando contiene afirmaciones falsas y cuyo efecto es difamatorio. Íd., pág. 271. Al resolver, el Tribunal concluyó que la publicación de información falsa o comentarios injustificados relacionados

con la conducta oficial de un funcionario público no genera responsabilidad automática, pues se consideran inmunes de reclamaciones por libelo y gozan de un privilegio restringido, salvo que el afectado demuestre que la publicación se hizo con malicia real. Íd., págs. 279-280; Véase, también, Torres Silva v. El Mundo, Inc., 106 DPR 415, 421 (1977). En otras palabras, la persona interesada debe probar que la información fue publicada "a sabiendas de que era falsa o con grave menosprecio de si era falsa o no". Torres Silva v. El Mundo, Inc., supra, pág. 421.

En ese caso, el Tribunal Supremo federal atendió una controversia que involucraba a una figura pública, lo cual se distingue de aquellos escenarios en que la persona afectada es una persona privada, ajena a la palestra pública. Pese a ello, esta fórmula se intentó extender a las acciones de libelo ejercitadas por una persona privada. Véase, Gertz v. Robert Welch, Inc., 418 U.S. 323, 329-332 (1974). No obstante, "[l]a naturaleza del asunto independientemente de la condición de la persona difamada como determinante para la aplicación de la doctrina vino a constituir un serio obstáculo a las acciones de daños por libelo, en menoscabo del interés individual en la protección de la reputación". Torres Silva v. El Mundo, Inc., supra, pág. 421.

Por consiguiente, en Gertz v. Robert Welch, Inc., supra, el Tribunal Supremo de Estados Unidos atemperó la doctrina en cuanto a difamación de figuras privadas y, **en reconocimiento de que estas ameritan un mayor grado de protección, ya que no tienen el mismo grado de exposición ni de acceso a los medios**

**para contrarrestar las declaraciones falsas, permitió a los estados exigir un estándar de culpa menor siempre y cuando no se imponga responsabilidad objetiva**. En esencia concluyó que los estados tienen derecho a regular la materia de difamación condicionado a que no establezcan un esquema que imponga responsabilidad sin culpa. Tampoco permitió imponer daños punitivos o establecer presunciones de daño sin probar malicia real. A esos efectos, el Máximo Foro federal expresó: "*We hold that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth*". Íd., pág. 349.

En esa línea, siempre que no se imponga responsabilidad objetiva, ni se reduzcan las garantías de la Primera Enmienda de la Constitución federal, el derecho local es la fuente primaria para sopesar los intereses involucrados en un caso de difamación. Ojeda v. El Vocero, supra, pág. 327.

Con base en estos precedentes, nuestra jurisdicción reconoce que las reclamaciones en daños y perjuicios por libelo y difamación se manifiestan en dos vertientes, cada una con un *quantum* probatorio distinto: la de figura privada y la de figura pública. Meléndez Vega v. El Vocero de PR, 189 DPR 123, 147 (2013).

Por consiguiente, quien adjudica una controversia de esta naturaleza debe identificar inicialmente la condición de la persona difamada, es decir, auscultar si el agraviado es figura privada o pública. Véanse, García Cruz v. El Mundo, Inc., 108 DPR 174 (1978); Torres Silva v. El Mundo, Inc., supra.

Cuando la persona difamada es una persona privada, es indispensable probar lo siguiente: (1) que la información es falsa; (2) que se divulgó a terceros de forma negligente, y (3) que se causaron daños reales. Torres Silva v. El Mundo, Inc., supra, pág. 427. Además, "las manifestaciones alegadamente difamatorias deben entenderse que son dirigidas a la persona del demandante, para que exista una relación de causalidad adecuada entre los daños sufridos y los actos negligentes o culposos del demandado". Colón, Ramírez v. Televicentro de P.R., 175 DPR 690, 726 (2009).

Asimismo, los familiares de una persona difamada pueden reclamar compensación por sus propios daños o angustias mentales a causa de la difamación. Soc. de Gananciales v. El Vocero de P.R., supra, pág. 135. Sin embargo, su reclamación es contingente a la causa de acción de la persona difamada. Íd.

En cambio, cuando la parte afectada es una figura pública, para prevalecer en la acción tendrá que probar que la difamación fue producto de malicia real. Garib Bazain v. Clavell, 135 DPR 475, 482 (1994). Es decir, deberá evidenciar que la publicación difamatoria se realizó a sabiendas de la falsedad de lo divulgado o con grave menosprecio de la verdad. El elemento subjetivo de malicia real exige el estándar probatorio intermedio de prueba clara, robusta y convincente. García Cruz v. El Mundo, Inc., supra, pág. 180. En cambio, **en casos de difamación de figuras privadas no se exige probar malicia real sino mera negligencia.** Torres Silva v. El Mundo, Inc., supra, pág. 423.

Tradicionalmente, una manifestación que imputa la comisión de un delito se consideraba difamatoria *per se*. Pérez v. El Vocero de P.R., supra, pág. 442; Pueblo v. Prensa Insular, 69 DPR 683, 695 (1949); Moraza v. Rexach Sporting Corp., 68 DPR 468, 471 (1948). Esta modalidad de difamación *per se,* desarrollada por el derecho común, reflejaba la noción de que ciertas imputaciones eran tan graves y potencialmente nocivas, que se entendían difamatorias de su faz. De ese modo, se desarrollaron las categorías de difamación *per se* y difamación *per quod*. Cuando un acto se enmarcaba en la clasificación de difamación *per se* no era necesario probar un daño específico, mientras que en las *per quod* sí era necesario. Así, por ejemplo, la definición de calumnia en la Ley de Libelo y Calumnia, supra, incluía toda publicación "que impute a una persona la comisión de un hecho constitutivo de delito, […] o que, como consecuencia natural, le cause daños reales y efectivos". Sec. 3, 32 LPRA sec. 3143. Asimismo, la mencionada ley establecía una presunción de malicia para toda difamación, salvo limitadas excepciones expresamente enumeradas. Sec. 5, 32 LPRA sec. 3145.

En Moraza v. Rexach Sporting Corp., supra, págs. 471-472, razonamos que la determinación de si existe difamación *per se* puede variar en función del contexto en el que se profieren las manifestaciones. Así, sostuvimos que

> la manifestación de que el demandante es un pillo es calumniosa per se, si dicho epíteto se emplea literalmente para imputar la comisión de un delito. Pero si las circunstancias y el resto del lenguaje empleado demuestran que la frase se profirió en sentido figurado como una mera expresión de abuso en un arrebato de excitación y pasión, esto no

constituye la imputación de que el demandante cometió un delito, y en consecuencia, no es calumniosa per se. Íd.

Por mucho tiempo, el estándar para prevalecer fue que "cuando el escrito es difamatorio per se y no hay privilegio a favor del demandado, con esto le basta al demandante para tener derecho a recibir a lo menos daños nominales, sin que tenga que probarlos especialmente". Rivera v. Martínez, 26 DPR 760, 764-765 (1918), citando a Quiñones v. J. T. Silva Banking & Commercial Co., 16 DPR 696, 702 (1910).

No obstante, el caso New York Times Co. v. Sullivan, supra, modificó el paradigma en materia de difamación al plantear por vez primera la necesidad de armonizar la protección de la honra individual con el derecho a la libre expresión y a la libertad de prensa bajo la Primera Enmienda de la Constitución. En ese contexto, el Tribunal Supremo de Estados Unidos introdujo el estándar más elevado de malicia real que hoy aplica a las figuras públicas.

Aclarado ese extremo, cabe resaltar que la suficiencia probatoria para establecer negligencia plantea una cuestión estrictamente de derecho. Villanueva v. Hernández Class, 128 DPR 618, 644-645 (1991); Colón, Ramírez v. Televicentro de P.R., supra, pág. 725. Al determinar si existe negligencia, el tribunal deberá considerar los factores siguientes:

> 1) La naturaleza de la información publicada, la importancia del asunto que trata y especialmente si ésta es difamatoria de su propia faz y puede preverse el riesgo de daños.
> 2) Origen de la información y confiabilidad de su fuente.
> 3) Razonabilidad del cotejo de la veracidad de la información tomando en consideración el costo en términos de dinero, tiempo, personal, urgencia de la

publicación, carácter de la noticia y cualquier otro factor pertinente. <u>Torres Silva v. El Mundo, Inc.,</u> <u>supra</u>, pág. 425.

Por su parte, como regla general la libertad de prensa protege "tanto la manifestación veraz como la incorrecta". <u>Zequeira Blanco v. El Mundo, Inc.,</u> 106 DPR 432, 436 (1977)(opinión de pluralidad). Esto es así porque "[l]a verificación de noticias es un proceso costoso en dinero, tiempo y personal que sólo debe exigirse cuando de la propia faz de la información surgen dudas de su veracidad o cuando la información pueda ser fácilmente comprobada debido a circunstancias especiales". <u>Torres Silva v. El Mundo, Inc.,</u> <u>supra</u>, pág. 426.

### B. Daños morales

"Hemos visto cómo desde principios de siglo nuestra doctrina jurisprudencial ha expandido paulatinamente los parámetros de lo que constituyen daños compensables con miras a lograr la más completa y justiciera reparación del daño inferido". <u>Cintrón Adorno v. Gómez,</u> 147 DPR 576, 599 (1999). Los daños morales son aquellos daños que pertenecen al mundo sensible del ser humano. <u>Ramos Rivera v. E.L.A.,</u> 90 DPR 828, 831 (1964); <u>Hernández v. Fournier,</u> 80 DPR 93, 103 (1957).

Tanto los daños morales como las angustias mentales se consideran daños no patrimoniales, por lo que su valoración económica no es susceptible de cuantificación matemática. <u>García Pagán v. Shiley Caribbean, etc.,</u> 122 DPR 193, 206 (1988). Sin embargo, no por eso dejan de ser compensables en dinero. <u>Íd</u>. Asimismo, hemos expresado que

al adjudicar daños estamos [sic] conscientes que el dolor humano (físico y espiritual) no es similar ni pecuniariamente cotizable. El dinero y el dolor "son bienes de tan distinta categoría que no cabe comparación. Pero si el dinero no es suficiente para reparar este tipo de daños, es preferible que la víctima reciba una indemnización insuficiente a que no reciba ninguna. Cintrón Adorno v. Gómez, supra, pág. 600, citando a Riley v. Rodríguez De Pacheco, 119 DPR 762, 804 (1987).

Sin duda, la estimación y valorización de daños es una gestión o tarea difícil, pues supone cierto grado de especulación e involucra elementos subjetivos como la discreción y el sentido de justicia y conciencia humana del juzgador de los hechos. S.L.G. Rodríguez v. Nationwide, 156 DPR 614, 622 (2002).

En esa tesitura, la reputación constituye un bien jurídico autónomo e intangible cuya lesión no está supeditada a la demostración de pérdidas económicas concretas ni a consecuencias materiales directas. Este Tribunal ha dejado claro que el derecho a la reputación y al buen nombre se protege como un interés propio, independiente de otros daños patrimoniales. Véase, Porto y Siurano v. Bentley P.R., Inc., 132 DPR 331, 343 (1992).

III

**A.**

Según expuesto previamente, el Tribunal de Primera Instancia determinó que GFR publicó información falsa que imputaba al señor Cora Colón la comisión de un delito grave sobre fraude bancario. A su vez, el foro primario entendió que la prueba sustentaba la negligencia del periódico. Surge de la sentencia del foro primario, según reproducida en el dictamen

recurrido, que "la información publicada el 23 de mayo y 11 de julio de 2015 por El Nuevo Día [es] falsa[], [fue] publicada[] negligentemente y no [está] protegida[] por el privilegio del 'reporte justo y verdadero'". <u>Ap. del *certiorari*</u>, pág. 48.

A pesar de ello, el foro primario desestimó la demanda porque estimó que el señor Cora Colón no presentó prueba creíble de haber sufrido daños reales a consecuencia de la difamación. Posteriormente, el Tribunal de Apelaciones rehusó interferir con las determinaciones de hecho del foro primario y confirmó su determinación. Ahora bien, en cuanto al estándar probatorio aplicable a la controversia el foro intermedio enfatizó que, tanto el elemento de la negligencia como la acreditación de los daños reales sufridos por el señor Cora Colón, debía ser el de prueba clara, robusta y convincente. No le asiste la razón.

**Cuando quien promueve la acción de difamación es una figura privada, no procede exigir el estándar riguroso de prueba clara, robusta y convincente para prevalecer en su reclamo.** Dicho estándar solo aplica en el contexto de las figuras públicas, quienes, por su nivel de reconocimiento y exposición, vienen obligadas a probar la malicia real del demandado. La razón de ser de esa dicotomía, como bien se discutió en el acápite anterior, es el equilibrio entre la reputación individual y la libertad de expresión y prensa. **Extrapolar este estándar riguroso a una figura privada, que no se ha expuesto voluntariamente al escrutinio público ni tiene el mismo acceso a los medios de difusión masiva, no se**

**justifica y, además, conlleva una carga onerosa e injustificada para un demandante privado.**

Así las cosas, **aclaramos que en Puerto Rico la negligencia y los daños resultantes de la difamación de figuras privadas se acreditan mediante al estándar ordinario de preponderancia de la prueba.** Esa siempre ha sido y continúa siendo la norma. Así pues, los elementos de la causa de acción de difamación no deben probarse con exactitud matemática, "sino que basta con precisar aquellos hechos que, con mayor probabilidad, ocurrieron". Pueblo v. Torres Huertas, 2025 TSPR 79, 216 DPR __ (2025). Véase, Zambrana v. Hospital Santo Asilo de Damas, 109 DPR 517, 521 (1980).

Dicho esto, reconocemos que en Colón, Ramírez v. Televicentro de PR, supra, se hizo una alusión genérica a que la prueba de malicia real o negligencia debía ser clara, robusta y convincente. No obstante, esa referencia no constituyó la norma del caso, no está respaldada por la Ley de Libelo y Calumnia, supra, u otro estatuto, ni respondió a un análisis dirigido a redefinir el estándar probatorio aplicable a la negligencia. Se trató de una expresión incidental, *dicta*, ajena al eje central de la controversia y, por tanto, debe tenerse por no puesta. Ortiz v. Panel F. E. I., 155 DPR 219, 252 (2001).

### B.

Superado este escollo, procedemos a resolver la cuestión neurálgica: si erró el Tribunal de Apelaciones al confirmar una sentencia en la que el Tribunal de Primera Instancia, a pesar de determinar que se probó la difamación y la negligencia

de GFR, estimó que hubo ausencia de prueba creíble de daños reales.

En cuanto al elemento de negligencia no hay controversia respecto a que GFR debió conocer que los cargos contra el señor Cora Colón se habían retirado, pues este hecho surgía claramente del expediente del caso federal. Además, aunque ello no es medular, se probó que la periodista que redactó las notas cubrió el caso penal desde sus inicios. Por ende, tenía conocimiento personal del curso de los procedimientos. Más aún, el foro primario determinó como hecho incontrovertido que el señor Cora Colón le solicitó al medio de comunicación eliminar o rectificar la noticia antes de presentar su demanda. Aun así, luego de presentada la demanda de difamación, y con la publicación accesible por la internet por más de siete años, no se realizaron las correcciones pertinentes a la nota periodística.

En el contexto de una publicación digital, la permanencia durante años de una imputación falsa de culpabilidad penal bajo el control editorial absoluto del medio es altamente pertinente para evaluar el elemento de culpa. Una vez el medio conoce, o razonablemente debe conocer, que la información publicada en internet es incorrecta, la omisión de corregirla o retirarla agrava la conducta y la previsibilidad del daño. En ese sentido, hemos expresado que la extensión del agravio, distribución y circulación de la publicación son elementos valorativos de los daños ocasionados. Díaz Segarra v. El Vocero, 105 DPR 850, 852 (1977).

Además, la sentencia desestimatoria confirmada por el Tribunal de Apelaciones concluyó:

> En cuanto a los daños, el demandante Eduardo Cora Colón declaró que, las publicaciones de las noticias que nos ocupa, los vecinos lo trataban con distancia, que en una ocasión una vecina le preguntó cómo estaba bregando con la probatoria. También declaró que al observar a sus padres sufriendo al leer las noticias antes mencionadas, le causó frustración, coraje y preocupación. Más allá de lo antes mencionado, el demandante no presentó prueba sobre sus daños emocionales y morales. Ap. del certiorari, págs. 48-49.

Como vemos, del propio texto de la *Sentencia* del Tribunal de Primera Instancia y de las determinaciones de hechos que ese foro consignó como probadas, surgen hechos que describen circunstancias objetivas relacionadas con la afectación de la reputación, la imagen social y la honra del demandante, así como angustias mentales asociadas a la percepción pública generada por las publicaciones falsas.

Según esas determinaciones, personas del entorno social y profesional del señor Cora Colón vieron las publicaciones y se comunicaron con él o con su patrono para cuestionar la información, incluyendo empleados bajo su supervisión, amistades y terceros vinculados con su ámbito laboral. Su supervisor inmediato manifestó haber recibido múltiples comunicaciones relacionadas con las noticias falsas, lo que generó dudas y cuestionamientos sobre la reputación del demandante en el entorno de trabajo. Vecinos asumieron que el demandante cumplía una probatoria federal y le preguntaron directamente al respecto. Otras personas interpretaron, a partir de las publicaciones, que tenía un récord criminal federal. Amistades se distanciaron del núcleo familiar y la

familia fue excluida de actividades sociales. Su esposa recibió comentarios en redes sociales y se vio obligada a aclarar públicamente la falsedad de la información.

La sentencia del foro primario también adoptó en las determinaciones de hechos probados que el demandante sintió vergüenza, frustración, coraje y preocupación como resultado de las publicaciones, así como angustia ante la posibilidad constante de que terceros, clientes o personas con quienes interactuaba profesionalmente hubieren investigado su nombre en internet y accedido a la información falsa.

Asimismo, entre los hechos se expuso que en la industria en la que labora el demandante es práctica común investigar en internet a las personas con quienes se pretenden establecer relaciones comerciales o profesionales. Aun después de la desestimación del caso criminal, el demandante continuó siendo confrontado por terceros respecto a las publicaciones falsas, reviviendo recurrentemente el estigma asociado con la imputación criminal.

Reiteramos que todos esos hechos fueron expresamente consignados por el Tribunal de Primera Instancia como determinaciones de hecho sustentadas en la prueba presentada en el juicio. A la luz de esas determinaciones, resulta jurídicamente insostenible concluir que no hubo prueba creíble de daño a la reputación.

### C.

La evidencia indirecta o circunstancial es aquella que demuestra un hecho en controversia mediante la prueba de otro distinto. Regla 110(h) de Evidencia, 32 LPRA Ap. VI. Es decir,

la evidencia circunstancial es una inferencia razonable en base de un conjunto de hechos distintos. Sobre este particular, en Admor. F.S.E. v. Almacén Ramón Rosa, 151 DPR 711, 719 (2000), expresamos que:

> La característica fundamental de la prueba circunstancial es, pues, que la evidencia ofrecida, aunque fuere creída, no es, de suyo, suficiente para probar el hecho que se pretende probar con ella, sino que se requiere un **proceso de inferencias** en conjunción con otra evidencia ya admitida o por admitirse, o un razonamiento basado en la experiencia y en las inferencias que hace una persona razonable. La expresión "evidencia circunstancial" obedece a que se trata de que las circunstancias apuntan en dirección favorable a la inferencia. (Énfasis suplido). Íd.

Asimismo, hemos adjudicado que la evidencia indirecta o circunstancial es intrínsecamente equivalente a la evidencia directa. Admor. F.S.E. v. Almacén Ramón Rosa, supra, pág. 720; Pueblo v. Rivera Rivera, 117 DPR 283, 294 (1986); Pueblo v. Salgado Velázquez, 93 DPR 380, 383 (1966). Por ende, un caso puede probarse en su totalidad mediante evidencia indirecta o circunstancial, incluyendo los casos criminales. Pueblo v. Picó Vidal, 99 DPR 708, 713 (1971).

Esta Curia ha reconocido reiteradamente que los daños morales, incluyendo las angustias mentales, la humillación, el sufrimiento y el menoscabo de la honra, son daños intangibles. Santini Rivera v. Serv. Air, Inc., 137 DPR 1, 7 (1994). Su naturaleza hace que no siempre admitan datos materiales y prueba objetiva. Rivera v. S.L.G. Díaz, 165 DPR 408, 431 (2005). Por el contrario, la valorización de este tipo de daños permite cierto grado de especulación, mayor que en casos de daños patrimoniales. Íd. Véase, J. Puig Brutau, *Fundamentos de*

*Derecho Civil*, Barcelona, Ed. BOSCH, T. II, Vol. III, pág. 92 ("Al no ser posible una valoración patrimonial en esta clase de daños, la cuantía será fijada según el prudente criterio del juzgador"). Es decir, que, en el ejercicio de su discreción, el juzgador podrá hacer inferencias razonables sobre los daños ocasionados.

Cabe enfatizar que no se requiere prueba pericial para establecer la existencia de un daño moral o angustia emocional. Si bien la ausencia de prueba pericial puede afectar la cuantía concedida, esto no impide que el juzgador determine la existencia del daño mediante inferencias razonables basadas en la gravedad de la conducta y el testimonio del perjudicado. Véase, <u>Meléndez Vega v. El Vocero de PR</u>, <u>supra</u>, pág. 209.

No estamos ante un caso de insuficiencia de prueba. Si bien el derecho no permite presumir el daño, tampoco exige que se presente prueba directa de este. No es necesario que el demandante demuestre su ruina personal o profesional para prevalecer. La evidencia circunstancial puede llevar válidamente a concluir la existencia del daño. Por su naturaleza, la prueba circunstancial presupone algún grado de inferencia. Véase, <u>Admor. F.S.E. v. Almacén Ramón Rosa</u>, <u>supra</u>, pág. 719. Al fin y al cabo, la honra y la reputación son bienes jurídicos intangibles. El daño se manifiesta, muchas veces, en la duda sembrada y en la carga de convivir con una sospecha injusta. La intensidad de ese menoscabo incidirá, en su momento, en la cuantía de la indemnización, no en la viabilidad de la causa de acción. Pues, "el hecho de que exista cierto nivel de especulación en la prueba no nos impide proveer al

reclamante un remedio adecuado". <u>Rivera v. S.L.G. Díaz</u>, <u>supra</u>, pág. 437.

En ese contexto, no debemos confundir presunción con inferencia. Las inferencias razonables constituyen un mecanismo ordinario y legítimo de prueba circunstancial. Véanse, Regla 110(h) de Evidencia, <u>supra</u>; <u>McCormick on Evidence</u> (R. P. Mosteller ed.), 9na ed., Thomson Reuters, 2025, Vol. I, sec. 185.3, pág. 1215. ("Circumstantial evidence also may be testimonial, but even if the circumstances depicted are accepted as true, additional reasoning is required to reach the desired conclusion."). Véase también, J. H. Wigmore, <u>Evidence in Trial at Common Law</u>, Toronto, Little, Brown and Company, Vol. IA, sec. 25, pág. 952 (revisado por Peter Tillers). ("…all evidence must involve an inference from some fact to the proposition to be proved."). Evaluar hechos que no admiten demostración directa es parte esencial de la función adjudicativa.

A diferencia de la inferencia, "una presunción es una deducción de un hecho que la ley autoriza a hacer o requiere que se haga de otro hecho o grupo de hechos previamente establecidos en la acción". Regla 301(a) de Evidencia, <u>supra</u>. Las presunciones legales están reguladas expresamente por las Reglas 301 a la 305 de Evidencia, <u>supra</u>.

En este caso, la publicación cibernética de un artículo periodístico que afirma que una persona se declaró culpable de un delito grave constituye una aseveración de hecho objetivamente lesiva. Esta imputación conlleva una carga estigmatizante y es razonablemente previsible que cause

menoscabo a la reputación, la dignidad personal y la estima social del individuo afectado.

Sobre ese extremo, la imputación falsa de conducta criminal se consideraba una modalidad de difamación *per se* precisamente porque, por su propia naturaleza, genera descrédito, estigmatización y sospecha social. Si bien se ha descartado el uso de presunciones legales automáticas de daño en sustitución de la prueba, permanece intacto el razonamiento común que reconoce que ciertas imputaciones, por su gravedad, tienden a causar descrédito y rechazo social. En la era digital, ese efecto se intensifica. La información falsa no desaparece con la edición impresa, sino que se comparte, se repite y deja una huella digital imborrable.

En consecuencia, cuando se prueba que se publicó negligentemente una falsedad que imputa un crimen, el ordenamiento legal requiere que existan remedios disponibles ante su violación. Por consiguiente, cuando se acredita mediante prueba que la parte demandada publicó una información falsa en contra de una figura privada, y que su actuación fue negligente, se permite, a partir de esa prueba y del contexto fáctico demostrado, inferir razonablemente la existencia de un menoscabo a la reputación. Resolver lo contrario privaría de eficacia la protección constitucional de la honra y convertiría este derecho en un valor ideal sin fuerza normativa real.

Por lo anterior, concluimos que el señor Cora Colón logró demostrar que hubo un daño real a su reputación, como efecto de la publicación difamatoria de GFR. Por ello, tanto el señor

Cora Colón como su esposa, la señora Hernández Viera, tienen derecho a ser compensados por el daño sufrido a consecuencia de la actuación negligente de GFR. Le corresponde al foro primario valorar los daños en base a la prueba presentada.

IV

Por los fundamentos antes expuestos, se revoca la sentencia emitida por el Tribunal de Apelaciones. Se devuelve el caso al Tribunal de Primera Instancia para que proceda a determinar la compensación adecuada en proporción al daño sufrido, en conformidad con los principios aquí expuestos.

Se dictará Sentencia en conformidad.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Eduardo Cora Colón

    Peticionario

        v.

                           CC-2024-0610

Grupo Ferrer Rangel

    Recurrido


SENTENCIA

En San Juan, Puerto Rico, a 3 de junio de 2026.

Por los fundamentos antes expuestos en la Opinión que antecede, la cual se hace formar parte de esta Sentencia, se revoca la sentencia emitida por el Tribunal de Apelaciones. Se devuelve el caso al Tribunal de Primera Instancia para que proceda a determinar la compensación adecuada en proporción al daño sufrido, en conformidad con los principios aquí expuestos.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Candelario López emitió una Opinión de conformidad, a la cual se unieron la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Feliberti Cintrón. El Juez Asociado señor Colón Pérez emitió una Opinión disidente. La Jueza Presidenta Oronoz Rodríguez no intervino.


                      Javier O. Sepúlveda Rodríguez
                  Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Eduardo Cora Colón<br><br>Peticionario<br><br>v.<br><br>Grupo Ferré Rangel<br><br>Recurrido | CC-2024-0610 |

**Opinión de conformidad emitida por el Juez Asociado señor CANDELARIO LÓPEZ, a la cual se unen la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Feliberti Cintrón.**

En San Juan, Puerto Rico, a 3 de junio de 2026.

> *"Calumniad, calumniad, que algo quedará".*
> *Voltaire.*

Estoy conforme con la fundamentada Opinión que hoy emite este Tribunal, pues comparto plenamente el criterio de que, enfrentados dos intereses del más alto rango constitucional, la libertad de prensa no opera como un mecanismo de inmunidad contra la negligencia de un periodista, en detrimento del derecho a la intimidad y la protección de la honra individual de la persona difamada. Probadas la falsedad de la información publicada y la negligencia del medio al divulgarla --como sucedió en este caso--, es improcedente desestimar una acción sobre difamación solo porque la demostración de daños a la reputación y al buen nombre del agraviado o agraviada dependa de prueba circunstancial.

En efecto, en este caso, la grave --y falsa-- imputación de culpabilidad por la comisión de un delito de fraude bancario, unida a la prueba testimonial vertida sobre sus perjudiciales efectos en el agraviado, solo podía conducir a una determinación de responsabilidad extracontractual del Grupo Ferré Rangel. Por estas razones, avalo en su totalidad la Opinión emitida y su disposición del caso.

Establecida mi conformidad con la Opinión Mayoritaria, me mueve a expresarme por separado la sombría perspectiva que de ella deriva la Opinión Disidente, que formula una apasionada, pero fatalmente descontextualizada defensa de un derecho que no está en peligro y, en consecuencia, a tildarnos de verdugos de la que llama "la prensa libre". Y es que, en su apreciación, imponer responsabilidad a un periódico que no solo reconoció haber publicado información falsa sobre un ciudadano privado, sino que no la rectificó luego de que este le señalara su falsedad y la mantuvo disponible en su portal electrónico por casi una década sin retractarse en momento alguno, equivale a "degollar" la libertad de prensa al recortar las garantías constitucionales que la protegen. Nos advierte, por supuesto, que la forma de censura que hoy presuntamente adoptamos torna incierto el futuro de nuestra "débil democracia", pues desencadenará un temor a errar tan avasallador que se convertirá en "mordaza de la

palabra, de las ideas, de las voces que fiscalizan, del derecho de un pueblo a saber".

En este orwelliano relato --más digno de un régimen totalitario que sistemáticamente suprime libertades para afianzar su control que de un tribunal colegiado que las defiende--, la Opinión Disidente ignora el elefante en la habitación: ni El Nuevo Día es el *samizdat* ni con esta decisión lo arrojamos a los *gulags*.

Los autos reflejan, con un lujo de detalle poco visto en un caso de difamación, una actitud totalmente desprovista no solo de rigor jurídico, sino de las más elementales nociones de buena fe en el ejercicio de la función periodística, que la Opinión Disidente pasa por alto casi en su totalidad. En aras de mantener en el contexto correcto la discusión de esta controversia, me veo precisado a reaccionar.

La Opinión Mayoritaria recoge con especial precisión los hechos relevantes a este caso, por lo cual los adopto por referencia. De entrada, llama poderosamente la atención que, al articular su férrea defensa de la posición del conglomerado Ferré Rangel, la disidencia se desvía de las controversias ante nuestra consideración y pasa juicio no solo sobre los errores señalados por el peticionario sobre la suficiencia de prueba para demostrar los daños sufridos, **sino sobre la corrección de la determinación de negligencia como tal**. Así, dedica considerable esfuerzo a argüir que no se podía imputar negligencia al recurrido porque le

asistía la defensa del "reporte justo y verdadero", pues esta doctrina "protege, incluso, a quien publica información falsa o difamatoria, siempre que lo publicado sea un reflejo sustancial de lo acontecido en el procedimiento judicial reseñado".

Me parece evidente que estos planeamientos en la Opinión Disidente deben quedar totalmente al margen de la discusión. En primer término, tanto la falsedad de la información publicada como la negligencia fueron determinadas por el tribunal sentenciador **sin que fuesen impugnadas por el recurrido**. Quien comparece ante nos es la parte difamada, no la periodista ni el periódico, y nos señala errores que versan sobre la suficiencia de la prueba del daño, no sobre la determinación de negligencia. **En consecuencia, es inoficioso adjudicar la procedencia de defensas afirmativas a favor del recurrido, y así revertir una determinación final de negligencia que no es objeto de revisión.**

Al margen de lo anterior, cabe señalar que, aun atendida en los méritos, la posición que adelanta la disidencia no es convincente. Como se sabe, para que se pueda configurar el privilegio de "reporte justo y verdadero" deben estar presentes dos requisitos: (1) el reporte tiene que ser justo con relación al proceso que es objeto de información, y (2) lo publicado tiene que ser cierto desde el punto de vista de que, aun cuando la información que se brinda en el procedimiento judicial,

legislativo u oficial sea inherentemente falsa o libelosa, el reportaje o noticia publicada es "cierto" en la medida en que refleja la verdad de lo expresado o acontecido en el procedimiento efectuado. Véase *Villanueva v. Hernández Class*, 128 DPR 618, 647 (1991). Es decir, quien publica información falsa quedaría protegido si su publicación capta lo acontecido tomando en cuenta el efecto que tendrá en la mente de un lector promedio --si es justo--, y si reporta fielmente lo expresado durante el procedimiento, aun cuando lo allí expresado resulte no ser cierto --si es verdadero.

Con este marco doctrinal en mente, está clara la improcedencia de esta defensa en favor del recurrido. Durante juicio en su fondo la periodista que redactó las notas publicadas reconoció que eran falsas y admitió que el expediente electrónico del caso criminal que estaba cubriendo para el recurrido no refleja que el peticionario se declaró culpable. **Dicho de otro modo, admitió que la información que divulgó es contraria a lo que consta en el expediente del caso**. Así las cosas, esta defensa no puede asistirle al recurrido, pues el privilegio de "reporte justo y verdadero" requiere que la información publicada recoja fielmente lo expresado. En este caso, las notas publicadas reflejan información contraria a la que obra en el expediente judicial, circunstancia únicamente atribuible a la propia periodista. La conclusión puede ser solo una: aun si estuviésemos facultados en esta etapa para

atender esta materia, no estarían presentes los requisitos de aplicación de esta doctrina.

Resulta igualmente insostenible la contención central de la Opinión Disidente de que estamos instaurando por vía jurisprudencial "una presunción de daños sin probar malicia real", en contravención de las protecciones mínimas que exige la Primera Enmienda de la Constitución de los Estados Unidos. Según la disidencia, en casos como este, en que el agraviado es una persona privada pero la publicación controvertida versa sobre asuntos de interés público, se permite imponer responsabilidad si se demuestra que la información falsa y difamatoria se publicó negligentemente, siempre que se adjudiquen solo daños reales. Sin embargo, la Primera Enmienda impide imponer responsabilidad objetiva, daños punitivos o presumir los elementos de culpa o negligencia a menos que se pruebe malicia real. Puesto que --según la Opinión Disidente-- la Opinión Mayoritaria impone responsabilidad al recurrido a base de una presunción de negligencia, incumplió con el estándar de malicia real aplicable.

En efecto, el estándar bajo el cual la Opinión Mayoritaria examina esta controversia es el aplicable a la persona privada que ha sido difamada mediante una publicación de interés público. Véase *Gertz v. Rober Welch, Inc.*, 418 US 323 (1974). Por lo tanto, ambas ponencias basan su razonamiento en la misma norma. La diferencia estriba en la caracterización que cada cual hace de la

prueba utilizada en la Opinión Mayoritaria para justificar la imposición de responsabilidad contra el Grupo Ferré Rangel. Según la mayoría, el peticionario podía demostrar sus daños a través de prueba circunstancial y de inferencias razonables que pudieran hacerse de la prueba desfilada. La Opinión Disidente rechaza este enfoque, y aduce que, en lugar de inferencias razonables, lo que pretende la mayoría es que se presuma que el simple hecho de la publicación difamatoria prueba el daño *per se*, y que ciertas declaraciones en las que la mayoría basa su análisis fueron admitidas de manera limitada.

Desde mi perspectiva, la conclusión de la disidencia está divorciada de la realidad. En cuanto a esto, las determinaciones de hecho emitidas por el foro de instancia son dispositivas. El tribunal sentenciador estimó probado que para las fechas en que la periodista de El Nuevo Día publicó las notas que indicaban que el peticionario hizo alegación de culpabilidad, su caso ya había sido desestimado. También quedó probado que este solicitó la rectificación de estas notas, y que el recurrido no rectificó la información. La periodista admitió durante juicio en su fondo que, aunque recogió en sus notas que el peticionario se declaró culpable, el expediente del tribunal no refleja esto. También reconoció que la noticia era falsa, que el expediente no estaba restringido --por lo cual podía acceder al mismo a conveniencia--, y que la plataforma del periódico permite enmendar una nota o

colocar otra. Incluso admitió que cuando una noticia es errónea o falsa, el periódico la rectifica mediante una nota aclaratoria, lo que en este caso no sucedió. No hay duda de que se publicó información falsa del peticionario, y que medió negligencia en ello por la parte recurrida.

Tampoco debe quedar duda de que la prueba desfilada permite realizar las inferencias en que descansa la Opinión Mayoritaria. Como parte de la sentencia, se estimó probado --sin que la recurrida solicitara su revisión-- que al llegar a su puesto de trabajo se estaban circulando noticias negativas sobre el peticionario indicando que se había declarado culpable y que estaba cooperando, que los vecinos dejaron de hablarle y que lo excluyeron socialmente personas que se enteraron de esta noticia falsa. Es también un hecho probado que tras estos incidentes revivió lo ocurrido y sintió vergüenza. Además, sus vecinos lo trataron "con distancia" y creían que estaba en probatoria. También se aceptó el testimonio de un supervisor del peticionario, quien declaró que al enterarse de la noticia de su arresto sintió muchas "emociones, dudas e interrogantes". Como reza la Opinión Mayoritaria, los vecinos del peticionario asumieron que estaba en probatoria, y otros pensaron que tenía expediente criminal.

Todos estos hechos constan como determinaciones emitidas por el tribunal en su sentencia. En comparación, es llamativa la maleabilidad que la Opinión Disidente adscribe a los hechos de este caso. En lugar de partir de

las determinaciones de hechos formuladas por el foro de instancia y mantener incólume la determinación de negligencia que no impugnó y no está en controversia en esta etapa, la disidencia saca de contexto aspectos fundamentales del caso, lo que torna renco su análisis. A manera de ejemplo, al describir el contenido de los artículos que publicó el recurrido en su portal cibernético, la Opinión Disidente enfatiza que "ninguna [de estas publicaciones] se enfocó en el señor Cora Colón", sino en otros acusados. Intenta minimizar, además, aquellas partes de estas publicaciones que mencionan al peticionario por nombre y apellido llamándoles "párrafos de contexto". De igual modo, enfatizó que a la periodista que publicó las notas en cuestión "le resultaba imposible e impráctico verificar todas las entradas de todos los casos que cubría".

Aun ante su intento por reducir el impacto de las publicaciones, lo cierto es que la propia periodista aceptó la falsedad de la información, y reconoció que de haber sabido que era falsa, hubiese corregido la nota. Existiendo tales admisiones y determinaciones de hechos, la negligencia quedó ampliamente demostrada. Dejando de lado la soltura con la que la Opinión Disidente desecha estos aspectos fundamentales del caso, es correcto en derecho concluir que se cumplió con el estándar probatorio mediante inferencias razonables que parten de prueba circunstancial.

En cuanto a los demás defectos en la "retahíla de errores doctrinales" de la que supuestamente adolece la Opinión mayoritariamente avalada, entiendo prudente dejar que la Opinión hable por sí misma en cuanto a ellos.

Mención aparte merece la ni tan velada invitación que la disidencia extiende al recurrido para que continúe su proceso de revisión hasta el Tribunal Supremo federal, casi garantizando la rectificación del "error" que hoy cometemos por tratarse un asunto de "particular importancia".

Independientemente de si la recurrida decide aceptar esta invitación o no, miro con recelo estas expresiones contenidas en la Opinión Disidente. Aunque no creo que haya rebasado la fina línea que separa la función de *informar* a una parte sobre su derecho a apelar, de la proscrita conducta de *instruir*, *fomentar* o *aconsejar* a una parte sobre la deseabilidad de hacerlo, entiendo que los Jueces y las Juezas de esta Curia debemos abstenernos de formular expresiones que puedan malinterpretarse en ese sentido. De especial importancia, entiendo improcedente no solo "advertir" de un resultado que no controlamos de forma alguna, sino citar advertencias pasadas a manera de presagio de éxito, especialmente si los hechos de ese caso anterior no son exactamente los que hoy se intiman.

En cuanto a esto, me remito al caso para el cual, inexplicablemente, la disidencia no ofrece cita: *Roman Catholic Archdiocese of San Juan v. Yali Acevedo*, 589 US 57 (2020). En este caso, la Iglesia Católica acudió ante

el Tribunal Supremo federal en revisión de la Opinión que emitimos en *Acevedo et al. v. Igl. Católica et al.,* 200 DPR 458 (2018). **En efecto, este recurso fue expedido, pero no para atender una determinación que "trastoca normas fundamentales en el tema de la separación de Iglesia y Estado", como sugiere la Opinión Disidente, sino para dejar sin efecto nuestra determinación por haberla tomado sin jurisdicción para hacerlo.[1] La controversia constitucional planteada ante el Tribunal Supremo federal no fue atendida.**

Ante la incongruencia entre lo intimado en la Opinión Disidente y lo realmente acontecido en el Tribunal Supremo federal, la prudencia aconseja mayor rigor con las representaciones que hacemos a quienes acuden ante este Tribunal.

En conclusión, ante los hechos de este caso y la conducta del recurrido, creo justo concluir mis expresiones lanzando mi propia pregunta retórica: ¿cuál es el derecho que con tanto ahínco la Opinión Disidente defiende? A juzgar por la conducta desplegada, da la impresión de que el reclamo ante nosotros no es de libertad de prensa, sino de una suerte de libertinaje periodístico que le exima de los límites que impone nuestro ordenamiento al derecho a

---

[1] En apretada síntesis, entablada la controversia entre las partes ante el Tribunal de Primera Instancia, la Iglesia solicitó que el caso fuese removido al tribunal federal, privando al foro local de jurisdicción. No obstante, más adelante las partes solicitaron que el caso regresara al foro estatal, pero antes de que el tribunal federal así lo ordenara, presentaron sendas mociones ante el foro de instancia que resultaron en las órdenes eventualmente impugnadas ante esta Curia. No habiéndose ordenado el regreso del caso al foro estatal, el TPI dictó estas órdenes sin jurisdicción para hacerlo, lo que tornó nulos los procedimientos ante nos.

la libre expresión. No puedo compartir la indignación que exhibe la Opinión Disidente. Por las razones expuestas, estoy conforme con la Opinión hoy emitida.


                                        Raúl A. Candelario López
                                             Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Eduardo Cora Colón<br><br>Peticionario<br><br>v.<br><br>Grupo Ferré Rangel<br><br>Recurrido | CC-2024-0610 |  |

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 3 de junio de 2026.

¿Qué será de nuestra sociedad cuando la oscuridad del silencio eclipse la luz de la libertad? ¿Qué será de nuestra débil democracia cuando el temor a errar se convierta en mordaza de la palabra, de las ideas, de las voces que fiscalizan, del derecho de un Pueblo a saber?

La censura pura y dura no es la única forma de degollar a la prensa libre, pues quien se empeñe en continuar recortando las garantías que la protegen, -- esas que se pensaban establecidas en nuestro País --, también se esconde tras el manto negro de su verdugo.

Sin lugar a duda, la honra, la reputación y la dignidad de los seres humanos son preceptos de la más alta jerarquía, de esencial importancia para el pleno disfrute y realización de la personalidad. Empero, nuestro orden jurídico ha establecido unos contornos y limitaciones a esos derechos, para dar paso al interés común de permitir las libertades de palabra y prensa, garantes de la comunicación colectiva.

Reconocido lo anterior, una vez más, -- ante un desafortunado desajuste en ese balance de intereses encontrados --, nos vemos precisados a utilizar nuestra voz disidente para alertar sobre una retahíla de errores doctrinales de la que adolece el fallo que hoy una mayoría de mis compañeras y compañeros de estrado avalan con su proceder. Uno que va desde ignorar la aplicabilidad de la defensa de "informe justo y verdadero" ante las constancias del abultado expediente judicial del caso criminal que originó las publicaciones aquí en controversia, hasta instaurar, por la vía jurisprudencial, una presunción de daños, -- sin probar malicia real en casos de difamación en los que la parte demandante sea una figura privada, pero la publicación verse sobre asuntos de interés público --, en clara violación de los preceptos mínimos que exige la Primera Enmienda de la Constitución de los Estados Unidos de América, *infra*, y su jurisprudencia interpretativa.

Con su proceder, una mayoría de este Tribunal ha descartado, injustificadamente, las determinaciones de credibilidad que, en este caso, realizó el Tribunal de Primera Instancia, las cuales fueron avaladas por el Tribunal de Apelaciones, para dar paso a una reclamación que, a todas luces, resulta improcedente, tanto por la ausencia de prueba creíble o confiable que la sustente, como por la presencia de una defensa que la derrota.

En ese sentido, llama la atención que, -- para forzar el resultado al que hoy se llega --, una mayoría de mis compañeras y compañeros de estrado haya descartado el

estándar de evidencia clara, robusta y convincente requerido para probar negligencia en casos de difamación, y, para demostrar este último punto, haya descansado en conclusiones derivadas de declaraciones de terceros enunciadas en el testimonio del propio demandante, lo que supone un problema de prueba de referencia.

Por último, y no menos importante, nos resulta alarmante que una mayoría de este Tribunal aproveche esta oportunidad, -- entiéndase, la que le brinda el atender la causa de epígrafe --, para imponer a la prensa de este País el oneroso deber legal de verificar la corrección absoluta de las miles, o, incluso, cientos de miles de publicaciones noticiosas que tenga colgadas en sus plataformas digitales, so pena de que la permanencia en ellas de una imputación falsa de delito, -- aunque sea inadvertida, bajo una teoría de que "razonablemente lo debió conocer" --, agrave su situación jurídica ante una demanda por difamación.

Evidentemente, el accidentado curso de acción que hoy aquí se sigue no puede ser consentido por el juez que suscribe. Por ello, **-- y, toda vez que estamos ante un dictamen judicial que posee todos los elementos necesarios para ser revisado por el Tribunal Supremo de los Estados Unidos --,** no nos queda más que disentir. Corresponde ahora que el Alto Foro Judicial Federal, si así lo solicitan las partes aquí afectadas, rectifique el error cometido por una mayoría de mis compañeras y compañeros de estrado, por tratarse aquí de un asunto de particular importancia en el tema de libertad de prensa; el cual, como cuestión de hecho,

ya ha sido atendido por dicho foro, en alguna de sus ramificaciones, desde *Gertz v. Robert Welch, Inc.*, *infra*, y según interpretado en *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, *infra*, y su progenie.

Similar advertencia hicimos, hace unos años atrás, en *Acevedo et al. v. Igl. Católica et al.*, 200 DPR 458 (2018), en el que, mediante una *Opinión* de este Tribunal, a nuestro juicio, se trastocaron normas fundamentales en el tema de la separación de Iglesia y Estado. Ello, no para vindicar la posición de este Juez, sino para que se revisara un fallo que adolecía de múltiples errores, entre los que se encontraban los enunciados por el que suscribe (planteamiento que, como cuestión de hecho, fue discutido por la *Opinión concurrente* emitida en aquella ocasión). Allí, el Alto Foro Judicial federal decidió intervenir.

En esta ocasión, teniendo ante nos un dictamen que incide directamente en el derecho constitucional a las libertades de expresión y prensa, -- tema que tanta casuística federal ha generado --, nos vemos en la obligación de replicar ese llamado. Veamos.

I.

Los hechos medulares que enmarcan la presente controversia se recogen, a grandes rasgos, en la *Opinión* que hoy emite este Tribunal, razón por la cual hemos decidido adoptar los mismos por referencia. No obstante, por su pertinencia para nuestra discusión, expondremos algunos detalles fácticos que surgen del expediente ante nos y que no se incluyen en la precitada narración.

En esencia, el 18 de mayo de 2017, el Sr. Eduardo Cora Colón (en adelante, "señor Cora Colón"), junto a la Sra. María de los Ángeles Hernández Vera (en adelante, "señora Hernández Vera"), presentó, ante el Tribunal de Primera Instancia, una *Demanda* en daños y perjuicios en contra de GFR Media, LLC (en adelante, "GFR Media"), empresa dueña del diario *El Nuevo Día* y sus plataformas digitales. En su recurso judicial, el señor Cora Colón adujo que el contenido de unas noticias publicadas por GFR Media los días 1 y 6 de julio de 2015, así como el 23 de mayo de 2016, le causó angustias mentales y lesiones a su reputación, por lo que solicitó daños por difamación.

En esencia, las referidas publicaciones noticiosas trataban sobre un prominente proceso criminal federal en el que se acusó a una veintena de personas, -- incluyendo a una exreina de belleza y abogada, la Sra. Sheila Benabe González (en adelante, "señora Benabe González"), así como al señor Cora Colón --,[1] por un presunto fraude bancario, en el caso *USA v. Prestol Rodríguez y otros*, Criminal Núm. 14-CR-00109. Cabe destacar que ninguna de las tres (3) publicaciones se enfocó en el señor Cora Colón, sino que

---

[1] El 25 de febrero de 2014, el Buró Federal de Investigaciones ("FBI", por sus siglas en inglés) diligenció una orden de arresto en contra del señor Cora Colón en el condominio donde éste residía junto a la señora Hernández Vera. Según el señor Cora Colón, los agentes federales irrumpieron en su apartamento, portando armas largas, entre 2:00 y 3:00 de la madrugada. Éste precisó que los referidos funcionarios, -- causando un "revolú" y "con gritería" frente a sus vecinos --, lo sacaron de su residencia en ropa interior y lo arrestaron en un pasillo. *Transcripción*, Apéndice del *Certiorari*, págs. 1311 y 1313-1314. Tras esa intervención, el 12 de febrero de 2014, el Gobierno federal presentó una acusación conjunta en contra del señor Cora Colón y otras diecinueve (19) personas por fraude bancario. No obstante, el 17 de noviembre de 2014, los cargos en contra del señor Cora Colón fueron desestimados, a petición de la fiscalía federal, mediante una moción sellada.

todas las noticias en cuestión se centraron en incidencias procesales relativas a otras personas acusadas.

Particularmente, el 1 de julio de 2015, GFR Media publicó, en la plataforma digital de *El Nuevo Día*, una noticia titulada "Coacusado de fraude a bancos se declarará culpable", bajo la firma de la periodista Mariana Cobián Rodríguez (en adelante, "periodista Cobián Rodríguez"). En esta nota periodística, enfocada en el coacusado Sr. Carlos Solís Guzmán (en adelante, "señor Solís Guzmán"), se incluyó la siguiente expresión: "[e]l resto de los acusados ya se declararon culpable". Asimismo, más adelante en la publicación, se incluyó el siguiente párrafo de contexto,[2] extraído íntegramente de una publicación anterior de esa misma cobertura noticiosa del 25 de febrero de 2014:

> Los demás acusados fueron identificados como José Santana Aponte, Carlos Vélez de Jesús, Ángel Torres Maymí, Brenda Mercado Rodríguez, Marilyn Meléndez Prestol, Johanna Rivera Benítez, Carlos Solís Guzmán, José Luis Negrón Molina, Alexander Cifuentes Ramos, Carlos Ortiz Dávila, Eduardo Cora Colón, Gabriel Baranda Collazo, Ricardo Santiago Verdecía, Marco Antonio Amber Torres, José Rafael Mora Nazario, Angélica Álvarez Castañeda, Adelinzy Grace Vázquez y Awilda Díaz Cabrera.[3]

---

[2] **En la jerga periodística, los párrafos de contexto, también conocidos como *tie-in* o *tie-back*, son aquellos que se incluyen en la noticia para "recordarle al lector la vinculación de [un] hecho con otras noticias ya sabidas: datos biográficos más destacados del protagonista o protagonistas, antecedentes del hecho, acontecimientos análogos ocurridos con anterioridad, etcétera".** (Énfasis suplido). M. Acevedo Cruz, *Manual para periodistas: Conocimientos y principios básicos*, San Juan, Ed. Plaza Mayor, 2014, pág. 234 (citando a M. Charnley, *Periodismo informativo*, Buenos Aires, Ed. Troquel, 1971). **Por su naturaleza, estos párrafos se tienden a repetir, -- incluso *ad verbatim* --, en noticias subsiguientes sobre los desarrollos de un acontecimiento noticioso, pues su propósito es, precisamente, comunicar los antecedentes del hecho novedoso, los cuales tienden a ser constantes a lo largo de toda la cobertura informativa.**

[3] Apéndice del *Certiorari*, págs. 285-289.

Posteriormente, el 6 de julio de 2015, GFR Media divulgó, -- también en la plataforma digital de *El Nuevo Día* y bajo la firma de la periodista Cobián Rodríguez --, una actualización de la noticia anterior, con un enfoque en el coacusado señor Solís Guzmán. En esta nueva publicación, también se incluyó el dato de que el "resto de los acusados ya se declararon culpable", así como el mismo párrafo de contexto de la lista de acusados, incluyendo el nombre del señor Cora Colón.

Transcurrido casi un (1) año después de esa última publicación, el 23 de mayo de 2016, GFR Media, -- del mismo modo que las notas anteriores --, publicó una noticia titulada "Fiscalía federal se echa hacia atrás en caso contra exreina de belleza", enfocada en los desarrollos del procedimiento criminal que se llevaba en contra de la señora Benabe González. En ésta, se informó que "la única de los 20 acusados que vería el juicio en su fondo era Benabe González, dado a que el resto de los imputados llegó a acuerdos con el gobierno federal e hizo alegación de culpabilidad". Además, en esta publicación, se incluyó nuevamente el párrafo de contexto sobre la lista de los veinte (20) acusados que figuraron en el proceso.

En vista de lo anterior, el señor Cora Colón argumentó, en su reclamación, que, al unir la expresión "el resto de los acusados" con la lista que incluía su nombre, se podría interpretar que él se había declarado culpable, lo que era incorrecto. Ello, debido a que los cargos en su contra fueron desestimados con perjuicio. Adujo, además,

que ese hecho surgía del expediente electrónico del caso federal, por lo que el medio demandado pudo haber corroborado dicha falsedad.

Tras varias incidencias procesales innecesarias aquí pormenorizar, se celebró el juicio en su fondo los días 20 y 21 de junio de 2023. Entre otros testigos, declararon el señor Cora Colón y la periodista Cobián Rodríguez.

En lo pertinente, el señor Cora Colón testificó que no fue hasta la divulgación de la última nota periodística, del 23 de mayo de 2016, que se enteró de las publicaciones en controversia. Asimismo, en su testimonio, recurrió, en numerosas ocasiones, a reproducir las declaraciones de compañeros de trabajo, vecinos y familiares para evidenciar las percepciones e impresiones que éstos habían tenido de él a raíz de las publicaciones.

**Dichas declaraciones vertidas en el testimonio del señor Cora Colón fueron impugnadas por GFR Media en reiteradas ocasiones, bajo el fundamento de que eran prueba de referencia inadmisible.[4] <u>Ante esas objeciones, el foro primario dictaminó que permitiría tales contestaciones a los únicos fines de facilitar la narración del testimonio del señor Cora Colón, pero que las mismas eran inadmisibles para probar la veracidad de la información por constituir "clásica prueba de referencia".</u>[5]** Ello, puesto que, "para probar la veracidad de la información, si ese es el

---

[4] Véase *Transcripción*, Apéndice del *Certiorari*, págs. 1207, 1219, 1227, 1257, 1260, 1263-1265, 1287.

[5] *Íd.*, págs. 1215, 1265 y 1288.

propósito, pues [la evidencia] no está [permitida, porque] sería prueba de referencia[; y,] si es otro propósito, pues realmente no es relevante".[6]

De otra parte, la periodista Cobián Rodríguez declaró que, a pesar de que revisaba con cierta frecuencia los récords electrónicos de los casos como parte de su trabajo periodístico en el Tribunal Federal, le resultaba imposible e impráctico verificar todas las entradas de todos los casos que cubría. Asimismo, señaló que, como el acceso a los expedientes federales se cobra por cantidad de páginas, no accedía o descargaba la totalidad del expediente del caso sobre el que fuese a escribir una nota periodística, sino sólo el documento relevante para la publicación que estuviese trabajando.

**Así las cosas, -- tras aquilatar la prueba presentada, así como las alegaciones y defensas expuestas por las partes --, el 11 de septiembre de 2023, el Tribunal de Primera Instancia notificó una *Sentencia*. Mediante ésta, el foro primario desestimó la *Demanda* de epígrafe por falta de prueba creíble o admisible que demostrara daños reales, lo que constituye un requisito indispensable.**

En específico, el Tribunal de Primera Instancia señaló que cierta información divulgada en las noticias del 23 de mayo y del 11 de julio de 2015 era falsa, se publicó de forma negligente y que no estaba protegida por el privilegio de "reporte justo y verdadero". **No obstante, el**

---

[6] *Íd.*, pág. 1265.

**foro primario sostuvo que la parte peticionaria no presentó prueba sobre sus daños emocionales y morales, así como tampoco produjo evidencia creíble que avalara que, como consecuencia de las publicaciones de las noticias, sufrió daños a su reputación.**

Asimismo, respecto a la señora Hernández Vera, el Tribunal de Primera Instancia determinó que, si bien su situación fue ocasionada por la negligencia de GFR Media, procedía la desestimación en su contra. Lo anterior, debido a que, cuando un tercero solicita indemnización por los daños propios sufridos a raíz de la difamación de otra persona, se requiere que proceda la acción principal para que la del tercero prospere.

Inconforme, y, habiéndose denegado su petición de reconsideración, el 7 de diciembre de 2023, la parte peticionaria presentó, ante el Tribunal de Apelaciones, un recurso de *Apelación*. En éste, alegó que el foro primario erró al no establecer hechos sustentados por la evidencia presentada en el juicio y al establecer hechos no sustentados. Arguyó que incidió, además, al determinar que no probó daños reputacionales y emocionales.

**El 4 de septiembre de 2024, el foro apelativo intermedio notificó una *Sentencia*, mediante la cual confirmó al Tribunal de Primera Instancia. El Tribunal de Apelaciones reiteró que, en un caso de daños por difamación reclamados por una persona privada, además de probar que la información publicada es falsa y que se debió a negligencia, se tiene que probar que se sufrieron daños**

**reales como consecuencia de la publicación difamatoria. Asimismo, concluyó que bastaba una lectura de los testimonios vertidos en el juicio para concluir que el récord estaba desprovisto de tal prueba.**

En desacuerdo todavía, el 4 de octubre de 2024, el señor Cora Colón acudió ante nos mediante un *certiorari*. En esencia, dicha parte planteó lo mismo que había esgrimido ante el foro primario y el apelativo intermedio.

Por su parte, el 15 de octubre de 2024, GFR Media presentó, ante nos, una *Oposición a expedición del auto de certiorari*.[7] Esencialmente, el medio sostiene que resulta insostenible revocar los fallos recurridos.

**En primer lugar, GFR Media señala que se aplicó correctamente la norma de deferencia a las determinaciones de hechos y de credibilidad del foro primario. En consecuencia, el medio aduce que la determinación de ausencia de prueba admisible o creíble de daños reales es fatal para la causa de acción de la parte peticionaria.**

**De igual modo, GFR Media indica, -- en sintonía con la defensa de "informe justo y verdadero" que esgrimió para derrotar el presente litigio --, que la Fiscalía Federal continuó haciendo referencia al nombre del señor Cora Colón en el legajo electrónico del caso criminal tras la desestimación de los cargos en contra de éste, incluso en un listado de nombres contenidos en el título de una moción relativa a la posición del gobierno respecto a los acusados**

---

[7] Asimismo, el 5 de mayo de 2025, dicha parte nos presentó su *Alegato en oposición a certiorari*.

**que se declararon culpables.** Véase *Oposición a expedición del auto de certiorari*, pág. 3. **En virtud de ello, el medio esboza que tal constancia del expediente judicial permite interpretar razonablemente que éste figuraba en ese grupo de personas que hicieron alegaciones preacordadas.**

**Por otro lado, GFR Media argumenta que, al no haberse alcanzado el umbral de malicia real, la pretensión de la parte recurrente de que se presuman daños a base de la publicación negligente de información falsa resulta improcedente bajo los estándares mínimos federales.**

**Finalmente, GFR Media aduce que la desestimación de la reclamación derivada de la señora Hernández Viera es una consecuencia jurídica inevitable del fracaso de la causa de acción principal del señor Cora Colón.**

No obstante, y, como adelantamos, hoy, una mayoría de mis compañeras y compañeros de estrado ha dejado a un lado las determinaciones de hechos y de credibilidad correctamente efectuadas por el Tribunal de Primera Instancia, avaladas por el Tribunal de Apelaciones; así como ha intentado darle la vuelta a ciertas prohibiciones que impone la Constitución federal, *infra*, para sostener una causa de acción, a todas luces, desprovista de evidencia admisible o confiable que la sustente, mediante la instauración de una presunción de daños, disfrazada de "inferencia razonable".

Por demás está decir que, con dicho curso de acción, no podemos estar de acuerdo. Procedemos, pues, a exponer nuestros fundamentos para disentir del mismo.

II.

A.

i.

Como es sabido, tanto la Constitución de los Estados Unidos de América como la Constitución del Estado Libre Asociado de Puerto Rico consagran las libertades de expresión y prensa como derechos fundamentales. Enmda. I, Const. EE. UU., LPRA, Tomo 1 y Art. II, Sec. 4, Const. ELA. PR, LPRA, Tomo 1. De igual modo, nuestra Carta de Derechos protege, -- de manera expresa --, la dignidad, la honra, la reputación y la intimidad de los seres humanos. Art. II, Secs. 1 y 8, Const. ELA. PR, *supra*.

Ante la coexistencia de las mencionadas garantías, casos como los que hoy atendemos, -- entiéndase, aquellos en los que se hace una alegación de difamación --, presentan una tensión inevitable entre los antes mencionados intereses constitucionales, a saber: (1) por un lado, resarcir los daños ocasionados por ataques abusivos e infundados a la reputación y a la honra de las personas injuriadas; y (2), por el otro, permitir el libre flujo de las ideas y la información sin el temor de que la mera expresión de una falsedad o imprecisión conllevará la imposición de responsabilidad civil. *Gómez Márquez et al. v. El Oriental*, 203 DPR 783, 795 (2020); *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 147 (2013); *Pérez v. El Vocero de P.R.*, 149 DPR 427, 441-442 (1999).

ii.

Así pues, en aras de atender el precitado dilema, en reiteradas ocasiones, hemos sentenciado que la jurista o el jurista debe acudir a lo dispuesto sobre el particular en la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, -- conforme al contenido mínimo que exige la Constitución de los Estados Unidos de América, *supra* --; así como el Artículo 1536 del Código Civil de 2020, 31 LPRA sec. 10801, antes el artículo 1802 del Código Civil de 1930, 31 LPRA sec. 5141 (derogado). Por lo tanto, no cabe ya referirse a la Ley de Libelo y Calumnia, Ley de 19 de febrero de 1902, 32 LPRA sec. 3141 *et seq.*, como la autoridad controlante en este tipo de asunto, ya que muchas de sus disposiciones están reñidas con las pautas constitucionales que gobiernan tales causas de acción. *Ojeda v. El Vocero de P.R.*, 137 DPR 315, 328 (1994); *Clavell v. El Vocero de P.R.*, 115 DPR 685, 690; *Cortés Portalatín v. Hau Colón*, 103 DPR 734, 737-738 (1975).

**Así, -- y, sujeto a la aplicabilidad de ciertas defensas afirmativas --, para que la parte demandante prevalezca en una causa de acción por difamación, debe alegar y probar lo siguiente: (1) que se publicó una información difamatoria y falsa; (2) que quien la publicó incurrió en malicia real o negligencia, dependiendo del si el demandante es una persona pública o privada;[8] y (3) que**

---

[8] Respecto a la dicotomía entre la persona pública y la privada, este Alto Foro ha señalado que su diferenciación radica en que, distinto de la privada, la figura pública, por lo general, tiene mayor acceso a los

**dicha divulgación le ocasionó daños reales**. *Pérez v. El Vocero de P.R.*, *supra*; *Garib Bazain v. Clavell*, 135 DPR 475 (1994); *Méndez Arocho v. Vocero de P.R.*, 130 DPR 867 (1992); *Ocasio v. Alcalde Mun. de Maunabo*, 121 DPR 37 (1988). Igualmente, constituye una exigencia de rango constitucional que la expresión difamatoria se refiera a la persona del demandante de modo particular, lo que se conoce en el *common law* como el requisito de "of and concerning the plaintiff". *Meléndez Vega v. El Vocero de PR*, *supra*, págs. 148-149; *Colón, Ramírez v. Televicentro de P.R.*, 175 DPR 690, 720 y 726; *Soc. de Gananciales v. El Vocero de P.R.*, 135 DPR 122, 128-133 (1994).

Cónsono con lo anterior, y, para determinar si la parte demandada incurrió en "malicia real", se debe evaluar si la publicación se hizo "a sabiendas de que era falsa o con grave menosprecio de si era falsa o no". *Torres Silva v. El Mundo, Inc.*, 106 DPR 415, 421 (1977); *Gómez Márquez et al. v. El Oriental*, *supra*, pág. 796; *Colón, Ramírez v. Televicentro de P.R.*, *supra*, pág. 708.

Por otro lado, para concluir que la parte demandada incurrió en negligencia, se debe examinar: (1) la naturaleza de la información publicada y la importancia del

---

medios de comunicación para refutar la publicación difamatoria y contrarrestar su efecto, así como se presume que se ha expuesto voluntariamente a ser objeto de un juicio más riguroso por el público. *Torres Silva v. El Mundo, Inc.*, *supra*; *Garib Bazain v. Clavell*, *supra*; *Clavell v. El Vocero de P.R.*, *supra*. Ahora bien, esa presunción "no se justifica en el caso de las figuras privadas que no se han lanzado a la palestra pública y cuyo interés en la reputación personal no ha sido menguado por ninguna actuación voluntaria de su parte". *Torres Silva v. El Mundo, Inc.*, *supra*, pág. 422.

asunto sobre el cual trata, especialmente si la información es libelosa de su faz y puede preverse el riesgo de daño; (2) el origen de la información y la confiabilidad de su fuente; y (3) la razonabilidad del cotejo de la veracidad de la información, lo cual se determina en consideración al costo en términos de dinero, tiempo, personal, la urgencia de la publicación, el carácter de la noticia y cualquier otro factor pertinente. *Gómez Márquez et al. v. El Oriental*, supra, pág. 806; *Colón, Ramírez v. Televicentro de P.R.*, supra, pág. 707; *Torres Silva v. El Mundo, Inc.*, supra, pág. 425.

**Cabe señalar que la prueba de que la parte demandada incurrió en malicia real o negligencia debe satisfacer el *quantum* de evidencia clara, robusta y convincente.** *Colón, Ramírez v. Televicentro de P.R.*, supra, pág. 725; *Clavell v. El Vocero de P.R.*, supra; *Soc. de Gananciales v. López*, 116 DPR 112, 115 (1985). **Como muy bien explicamos al adoptarlo, ese estándar probatorio más elevado en casos de difamación responde a que, "[p]ara la negación de un derecho fundamental, el debido proceso de ley exige que el valor y suficiencia de la prueba sea medido con el criterio de prueba clara, robusta y convincente".** *Colón, Ramírez v. Televicentro de P.R.*, supra, pág. 725 esc. 30 (citando a *In re Caratini Alvarado*, 153 DPR 575 (2001) y *P.P.D. v. Admor. Gen. de Elecciones*, 111 DPR 199, 223 (1981)). **Lamentablemente, tales postulados se abandonan en la *Opinión* que hoy emite este Tribunal.**

iii.

Si bien reconocemos que el marco general antes enunciado es el que regula los casos de difamación en nuestra jurisdicción, somos de la opinión que, para la completa y correcta disposición de los asuntos ante nuestra consideración, debemos aprovechar esta oportunidad para examinar también las pautas mínimas que sobre el asunto aquí en controversia exige la Constitución federal, *supra*, puesto que éstas representan el límite absoluto de cualquier norma que este Tribunal pueda pautar para restringir las libertades de expresión y prensa en este tipo de acciones. Véase J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2009, pág. 1000.

Y es que, distinto de lo expuesto en la *Opinión* del Tribunal, conforme al ámbito mínimo federal, no sólo se requiere distinguir entre la identidad de la persona demandante, sino que también se exige diferenciar el contenido de la publicación controvertida. Así, además de evaluar si la parte reclamante es una persona pública o privada, también resulta necesario determinar si el mensaje en cuestión trata sobre temas de interés público o si, por el contrario, se limita a ventilar asuntos de mero interés privado. **De lo anterior, surgen tres (3) estándares federales que debemos evaluar cuando tenemos ante nos un caso de difamación, en función de la identidad del demandante y de la naturaleza de lo divulgado. Evaluemos cada uno de éstos a continuación.**

Como primer escenario, se encuentran los casos en que la parte demandante se clasifica como una persona pública y, a su vez, el contenido de la publicación en controversia versa sobre asuntos de interés público. Tales circunstancias se rigen por el estándar instaurado en el caso fundamental de *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), y su progenie. En virtud de éste, se requiere que el demandante demuestre, -- mediante prueba clara y convincente --, que la publicación difamatoria se hizo con malicia real (*actual malice*), por imperativo constitucional federal. *Íd.*, pág. 285-286.

**Como segundo escenario, -- el que, a nuestro juicio, es el que aplica a los asuntos que hoy nos ocupan --, figuran las circunstancias en que la parte demandante se clasifique como una persona privada, pero la publicación controvertida verse sobre asuntos de interés público.[9] En dichos casos, el estándar aplicable es el de *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). Conforme a éste, se permite imponer responsabilidad cuando se demuestre que la información falsa y difamatoria se publicó negligentemente. <u>No obstante, se exige que se evidencien los agravios realmente sufridos, pues las protecciones emanantes de la Primera Enmienda, *supra*, impiden imponer responsabilidad objetiva o daños punitivos, así como prohíben presumir los</u>**

---

[9] **En numerosas ocasiones, el Tribunal Supremo federal ha clasificado publicaciones en las que se imputa conducta constitutiva de delito como de interés público, de modo que activan la Primera Enmienda, *supra*, aunque la parte demandante sea una persona privada**. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, *infra*, pág. 756; *Philadelphia Newspapers, Inc. v. Heps*, *infra*, pág. 776; *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 494-495 (1975).

**elementos de culpa o daños, a menos que se pruebe malicia**

**real**. *Íd.*, págs. 344-345.

Por último, como tercer escenario, están las controversias en que la parte promovente es una persona privada y el contenido de la divulgación trata puramente acerca de asuntos de mero interés privado. Esas circunstancias están gobernadas por el estándar delineado en *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985). A tenor de éste, los estados pueden imponer responsabilidad siguiendo los principios del *common law*, toda vez que el contenido de la publicación es de tan escaso valor para la discusión pública, que las libertades de expresión y prensa ceden ante el interés de resarcir los daños a la reputación y a la honra de las personas. *Íd.*, pág. 761. En consecuencia, en esas circunstancias, se permiten presumir los elementos de culpa y de daños, así como conceder daños punitivos. *Íd.*

A modo de síntesis, en *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986), el Tribunal Supremo federal resumió dichas normas mínimas de la siguiente manera:

> De las precitadas decisiones, se pueden discernir dos fuerzas que podrían modificar el panorama del *common law* para conformarlo a las exigencias de la Primera Enmienda. La primera radica en clasificar a la parte demandante como una persona pública, ya sea porque es un funcionario o una figura pública, o como una persona privada. La segunda consiste en determinar si la expresión en cuestión es de interés público. Cuando la publicación es de interés público y el demandante es un funcionario o una figura pública, la Constitución claramente requiere que el demandante sobrepase una barrera mucho más alta que la que establece el *common law* para responsabilizar a un medio de comunicación por

los daños sufridos. Cuando lo publicado es de interés público, pero el demandante es una persona privada, como en *Gertz*, la Constitución todavía desplaza los estándares del *common law*, pero las exigencias constitucionales son, hasta cierto punto, menos permisivas que en los casos en que el demandante es una persona pública y la publicación es de interés público. Cuando la expresión es exclusivamente de interés privado y el demandante es una persona privada, como en *Dun & Bradstreet*, los requisitos constitucionales no necesariamente exigen una modificación en, al menos, algunos de los aspectos de las normas del *common law*. (Traducción nuestra). *Íd.*, pág. 775.[10]

**En suma, queda claro que, en casos en que la parte demandante sea una persona privada, pero que el contenido de la publicación verse sobre asuntos de interés público, aplican las garantías mínimas de la Primera Enmienda de la Constitución federal**, Enmda. I, Const. EE. UU., *supra*. **<u>En consecuencia, ningún tribunal estatal puede autorizar que se infiera el sufrimiento de daños a base de la demostración de la falsedad de lo publicado negligentemente, sin que se haya satisfecho el estándar de malicia real</u>**. *Gertz v. Robert Welch, Inc.*, *supra*, págs. 348-350.

---

[10] ("One can discern in these decisions two forces that may reshape the common-law landscape to conform to the First Amendment. The first is whether the plaintiff is a public official or figure, or is instead a private figure. The second is whether the speech at issue is of public concern. When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law. When the speech is of public concern but the plaintiff is a private figure, as in *Gertz,* the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern. When the speech is of exclusively private concern and the plaintiff is a private figure, as in *Dun & Bradstreet,* the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape.").

iv.

Así las cosas, producto de los principios y normas que anteceden, este Tribunal ha establecido ciertas pautas para probar daños en casos de difamación. **Particularmente, este Alto Foro ha advertido que, al momento de determinar si procede imponer daños en este tipo de causas de acción, resulta imperativo asegurarse de que no se cree "un efecto disuasivo sobre la libertad de expresión, especialmente en cuanto a asuntos de interés público".** (Énfasis suplido). *Meléndez Vega v. El Vocero de PR*, *supra*, pág. 205; *Pérez v. El Vocero de P.R.*, *supra*, pág. 442.

**En consideración a ese interés, establecimos que la parte demandante "debe proveer evidencia que sustente que realmente quedó afectad[a] en su salud, bienestar y felicidad".** (Énfasis suplido). *Meléndez Vega v. El Vocero de PR*, *supra*, pág. 205 (citando a *Rivera v. S.L.G. Díaz*, 165 DPR 408, 431-432 (2005)). **Igualmente, pautamos que "[d]e ordinario, una reclamación en concepto de angustias mentales requiere la presentación de prueba pericial y documental, tanto para probar la validez de la reclamación como para que la parte adversa pueda defenderse adecuadamente".** (Énfasis suplido). *Íd.* (citando a *Berríos v. González et al.*, 151 DPR 327, 345 (2000)).

En esa dirección, y, aún en el caso de que se entienda que se puede prescindir de prueba pericial para determinar la existencia de daños morales a base de la credibilidad de los testimonios y de las circunstancias objetivas del caso, -- como afirma la *Opinión* del Tribunal --, somos de

la opinión que tales elementos tienen que estar presentes para sustentar tal conclusión. **En consecuencia, si el foro primario, -- que es el tribunal de hechos en nuestra jurisdicción --, no le brinda credibilidad a la prueba oral vertida en el juicio ni tampoco se presenta evidencia objetiva adicional, entonces, -- salvo error, pasión, perjuicio o parcialidad --, resulta improcedente colegir que se probaron los daños sufridos.**

v.

Ahora bien, establecido lo anterior, es menester tener presente aquí que, incluso cuando se satisfagan todos los requisitos que hemos mencionado, puede que la pretensión de la parte demandante en un caso de difamación quede derrotada ante la aplicabilidad de una de las defensas afirmativas que, para este tipo de asuntos, se han reconocido en nuestro acervo jurídico. Por ejemplo, ante una reclamación por difamación, la verdad siempre es una defensa absoluta, puesto que representa una negación frontal de la falsedad de lo publicado. No obstante, aun cuando lo publicado resulte ser falso o impreciso, nuestro ordenamiento jurídico ha reconocido algunas defensas afirmativas que se pudiesen invocar en ciertos contextos para derrotar la reclamación de la parte demandante. Una de éstas es la del "reporte justo y verdadero".

**La referida defensa es una de las pocas disposiciones de la Ley de Calumnia y Libelo de 1902, *supra*, que aún tienen vigencia en nuestros días, siendo ésta una exigencia**

**de la Constitución federal**, *supra*.[11] **En lo pertinente, la Sección 4 de dicha ley establece que no se presumirá que es maliciosa la publicación que se hace "en un informe justo y verdadero de un procedimiento judicial, legislativo u oficial, u otro procedimiento cualquiera, o de algo dicho en el curso de dichos procedimientos". Así, quien publique un informe justo y verdadero quedará excluido de responsabilidad legal al amparo del precitado estatuto.** Véase *Meléndez Vega v. El Vocero de PR*, *supra*, pág. 157; *Villanueva v. Hernández Class*, 128 DPR 618 (1991).

Al interpretar tal disposición, este Tribunal ha señalado que la defensa del "informe" o "reporte justo y verdadero" tiene dos (2) requisitos: (1) que el reporte fue *justo*, de modo que capturó la sustancia de lo acontecido y consideró el posible efecto que tendría en la mente de una persona receptora promedio; y (2) que lo publicado fue *cierto*, "desde el punto de vista de que -- aun cuando la información que se [brindó] en el procedimiento judicial, legislativo u oficial sea inherentemente falsa o libelosa -- el reportaje o noticia publicada [es cierto] por cuanto

---

[11] En *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978), el Tribunal Supremo federal señaló que "indistintamente de las diferencias que se puedan tener respecto a las interpretaciones de la Primera Enmienda, **existe un consenso casi universal de que un propósito primordial de dicha enmienda fue proteger la discusión abierta de los asuntos gubernamentales**". (Traducción nuestra y énfasis suplido). *Íd.*, pág. 838. Por otra parte, en *Cox Broadcasting Corp. v. Cohn*, *supra*, resolvió que, en una acción civil de daños, el medio de comunicación que publique información cierta que esté disponible al público queda protegido por la Constitución federal, *supra*. Asimismo, el tratadista Rodney A. Smolla nos comenta que "se ha sugerido que la defensa del reporte justo y verdadero podría ser una exigencia de la Primera Enmienda". 3 *Smolla & Nimmer on Freedom of Speech* Sec. 23:1 (abril 2022). Véase, además, *Torres, Santana v. Noticentro PR et al.*, 210 DPR 783, 828 (Colón Pérez, opinión de conformidad).

refleja la verdad de lo expresado o acontecido en el procedimiento". *Villanueva v. Hernández Class, supra*, pág. 647 (citando a *Caraballo v. P.R. Ilustrado, Inc.,* 70 DPR 283 (1949)). Véase, también, *Meléndez Vega v. El Vocero de PR, supra*, pág. 201-202.

**Respecto al segundo requisito, aclaramos que lo publicado no tiene que ser exactamente correcto, sino que basta con que haya difundido un extracto sustancial de lo ocurrido**. *Villanueva v. Hernández Class, supra*, págs. 647-648; *Meléndez Vega v. El Vocero de PR*, *supra*, pág. 201; *Torres, Santana v. Noticentro PR et al., supra*, págs. 825-826 (Colón Pérez, opinión de conformidad). Véase T. Barton Carter *et al., The First Amendment and the Fourth Estate: The Law of Mass Media*, 13.ra ed., Minnesota, Ed. Foundation Press, 2021, págs. 90-91. **Dicho de otro modo, la defensa del reporte justo y verdadero <u>"protege inclusive a quien publica información falsa o difamatoria", siempre y cuando ello sea un reflejo de lo acontecido</u>**. *Íd.*

También, hemos expresado que la referida defensa se pierde cuando se publica una parte de la historia de forma parcializada o subjetiva. *Villanueva v. Hernández Class, supra; Meléndez Vega v. El Vocero de PR, supra*, pág. 202. Ello ocurre si la parte demandante prueba "que [la parte demandada] publicó la información actuando maliciosamente, con ánimo prevenido, con el propósito de causar daño […] o conociendo la falsedad de la información". *Villanueva v. Hernández Class, supra*, pág. 649.

Así, una vez en un caso de difamación se interponga la defensa del "reporte justo y verdadero", corresponderá a la parte demandante probar que lo publicado no formaba parte de un procedimiento contemplado en la Sección 4 de la Ley de Calumnia y Libelo de 1902, *supra*. Particularmente, ésta deberá probar que el reporte no fue justo ni verdadero, porque, -- más allá de la veracidad o falsedad del contenido de lo publicado --, dejó de reflejar sustancialmente lo acontecido.

B.

Ahora bien, ante la palpable realidad de que el ámbito federal exige que, como mínimo, la parte demandante satisfaga el estándar de "malicia real" para permitir presumir daños en casos como el de autos, la *Opinión* del Tribunal se ha visto en la necesidad inescapable de pretender distinguir entre una "presunción legal" y una "inferencia razonable". Ello, con el objetivo de permitir presumir daños ante una evidente ausencia de prueba creíble o confiable, en un intento de esquivar la clara prohibición federal de tal proceder. Por lo tanto, también nos vemos precisados a repasar algunas instituciones del Derecho Probatorio aplicables al caso de marras.

i.

En primer lugar, como se sabe, la Regla 301 de Evidencia define una presunción como una deducción de un hecho que la ley autoriza a hacer o requiere que se haga de otro hecho o grupo de hechos previamente establecidos en la acción, en la que el hecho o grupo de hechos

previamente establecidos se les denomina "hecho básico" y al hecho deducido mediante la presunción se le conoce como "hecho presumido". 32 LPRA Ap. VI, R. 301. Es decir, una presunción legal se configura cuando, probado el hecho básico "A", el ordenamiento permite u obliga a inferir que ocurrió el hecho presumido "B".

**Al estudiarlas, el profesor Chiesa Aponte comenta que las presunciones no son otra cosa que "<u>reglas de inferencia que controlan o limitan la discreción del juzgador en el aspecto central de deducir o inferir las conclusiones pertinentes a partir de la totalidad de la evidencia presentada en el juicio</u>".** (Énfasis suplido). E.L. Chiesa Aponte, *Compendio de evidencia (En el sistema adversarial)*, Ciudad de México, Ed. Tirant lo Blanch, 2021, pág. 71.

**Además, el profesor Chiesa Aponte señala que algunos autores emplean el término "presunción" para referirse a aquellas en las que la ley obliga a inferir el hecho presumido ante una ausencia de prueba en contrario, mientras que usan la expresión "inferencia permisible" para referirse a las presunciones en las que la ley autoriza, mas no obliga, a inferir el hecho presumido habiéndose probado el hecho básico, pero ambos términos se refieren a presunciones.** *Íd.*, pág. 74.

Cabe mencionar que la Regla 304 de Evidencia, *supra*, establece, de manera expresa, que las presunciones legales son "establecidas por ley o **por decisiones judiciales**". (Énfasis suplido). Sobre este particular, el profesor Chiesa Aponte indica que, entre las múltiples fuentes que

las instauran, "la jurisprudencia ha reconocido presunciones sin base estatutaria". E.L. Chiesa Aponte, *Reglas de Evidencia comentadas*, 2.ª ed., San Juan, Ed. Situm, 2024, pág. 50.

**Así, y, partiendo de la máxima de que nuestras opiniones tienen fuerza de ley, entonces no hay duda de que, en esta ocasión, -- erradamente <u>y en un choque frontal con lo previamente dispuesto por el Tribunal Supremo de los Estados Unidos</u> --, una mayoría de este Tribunal ha instituido una presunción legal, mediante la cual, probado el hecho básico de la divulgación negligente de una información falsa, ahora es permisible que se "infiera razonablemente" el hecho presumido de que se han sufrido daños. Tal proceder, -- en casos de publicaciones de interés público, sin prueba de malicia real --, está vedado por las protecciones mínimas del ámbito federal. En consecuencia, este Alto Foro está impedido de permitir tal presunción de daños, como lo hizo aquí, indistintamente del nombre con el que la bautice o de las piruetas jurídicas a las que recurra para justificarla.**

ii.

**En segundo orden, y, como es también conocido, la prueba de referencia es toda declaración, que no sea la que la persona declarante hace en el juicio o vista, que se ofrece en evidencia para probar la verdad de lo aseverado.** Regla 801(c) de Evidencia, *supra*, R. 804. **En ausencia de una exclusión de la definición de prueba de referencia o de una excepción enumerada en las Reglas de Evidencia,**

**tales declaraciones son inadmisibles.** Regla 804 de Evidencia, *supra*, R. 804.

**La referida regla de exclusión de este tipo de prueba se justifica "por su falta de confiabilidad y por su dudoso valor probatorio, basado, precisamente, en la falta de confrontación entre el declarante y la parte contra la que se ofrece".** (Énfasis suplido). *In re Ríos Ríos*, 175 DPR 57, 75-76 (2008) (citando a E.L. Chiesa, *Tratado de derecho probatorio*, Santo Domingo, Ed. Corripio, 1998, T. II, págs. 616 y 631). Y es que, si la parte afectada por esa declaración no tiene la oportunidad de contrainterrogar a la persona declarante, entonces se expone a sufrir los peligros de la prueba de referencia (*hearsay dangers*), como la ambigüedad, la imprecisión, la descontextualización, el malentendido y hasta la mala memoria. Véase Chiesa Aponte, *Compendio de evidencia (En el sistema adversarial)*, *op. cit.*, págs. 314-315.

**En fin, y ya más en lo relacionado con las controversias que hoy nos ocupan, un testimonio del demandante sobre lo que le dijeron unas terceras personas fuera del juicio o vista, ofrecido para probar los daños sufridos a base de lo que estas personas vieron, interpretaron o pensaron de él, constituye, cuanto menos, prueba de muy escasa confiabilidad y, cuanto más, evidencia inadmisible por ser prueba de referencia.**

C.

Por último, y previo a disponer de los asuntos ante nuestra consideración, nos parece necesario refrescar las

normas que guían la revisión apelativa en casos de difamación. Al respecto, hemos establecido que, como foro revisor, debemos brindarle deferencia a la sana discreción de los foros sentenciadores, pues son éstos quienes están mejor posicionados para apreciar y adjudicar la credibilidad de la prueba y mejor conocen las particularidades del caso. Dicha discreción radica en el "poder para decidir en una u otra forma, esto es, para escoger entre uno o varios cursos de acción". *Citibank et al. v. ACBI et al.*, 200 DPR 724, 735 (2018); *García v. Padró*, 165 DPR 324, 334 (2005); *Pueblo v. Ortega Santiago*, 125 DPR 203, 211 (1990); *Pueblo v. Sánchez González*, 90 DPR 197, 200 (1964). Por tanto, dichas determinaciones "deben ser respetadas por los foros apelativos, a menos, claro está, que se demuestre arbitrariedad, un craso abuso de discreción, una determinación errónea que cause grave perjuicio a una de las partes, o la necesidad de un cambio de política procesal o sustantiva". *Rebollo López v. Gil Bonar*, 148 DPR 673, 678 (1999); *Gómez Márquez et al. v. El Oriental*, *supra*, pág. 793; *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770-772 (2013).

Ahora bien, en *Meléndez Vega v. El Vocero de P.R.*, *supra*, también tuvimos la oportunidad de delinear los contornos de la revisión apelativa en casos de difamación; especialmente, en aquellas instancias en que se requiera auscultar si se satisfizo el estándar de malicia real. Allí, -- tras discutir la jurisprudencia federal sobre el tema --, dictaminamos que, como imperativo constitucional,

**"los tribunales apelativos están obligados a sopesar por sí mismos, a través de una evaluación independiente de la prueba, si se estableció malicia real de manera clara y convincente en los casos de difamación de un funcionario público".** *Íd.*, págs. 153-154.

**No obstante, dejamos claro que, incluso en los casos en que se requiera realizar tal evaluación independiente de la evidencia, se mantiene la norma de deferencia al Tribunal de Primera Instancia en cuanto a las <u>determinaciones de credibilidad de los testigos</u>, la cual establece que los foros apelativos sólo deben intervenir con ellas cuando sean "claramente erróneas".** (Énfasis suplido). *Íd.*, 151-154. **Ello, debido a que es el foro primario, precisamente, quien tuvo la oportunidad de juzgar el comportamiento o *demeanor* de los declarantes.** *Íd.*

Adelantamos que esos principios tan fundamentales para nuestro sistema judicial, lamentablemente, tampoco se siguieron en esta ocasión. Nos explicamos.

## III.

De entrada, debemos aclarar que, como corolario de la norma de publicación única,[12] la omisión *a posteriori* de corregir o aclarar una falsedad o imprecisión en una publicación existente no constituye, en sí misma, una nueva

---

[12] Desde *Díaz Segara v. El Vocero*, 105 DPR 850, 852 (1977), adoptamos la regla de publicación única o unitaria, la cual establece que "la edición completa del periódico, revista o libro se considera una sola publicación que da lugar[,] en caso de libelo, a una sola causa de acción". Por lo tanto, hemos sentenciado que "las acciones por difamación **giran en torno a instancias individuales de publicación[,] y no a un efecto acumulativo**". (Énfasis suplido). *Cacho González v. Santarrosa*, 203 DPR 215, 225 (2019).

incidencia difamatoria, por lo que el objeto de nuestro análisis, en esta ocasión, radicaba estrictamente en las noticias controvertidas, -- tal y como fueron publicadas --, y no en la permanencia inalterada de éstas en la web tras un reclamo de rectificación.

Siendo ello así, en el caso de epígrafe, estábamos llamadas y llamados a evaluar si los foros recurridos erraron al concluir que procedía la desestimación de la reclamación por difamación instada por el señor Cora Colón a raíz de unas notas periodísticas publicadas en *El Nuevo Día*, tras la celebración de un juicio. Conforme al marco normativo que antecede, estamos convencidos de que no se cometieron los errores señalados. Veamos el porqué.

## A.

El señor Cora Colón aduce que las publicaciones controvertidas, -- al integrar la frase "el resto de los acusados ya se declararon culpable" con el párrafo de contexto que enumeraba su nombre entre veinte (20) personas acusadas en el proceso criminal federal --, indujeron a la audiencia lectora a creer, equivocadamente, que él había hecho una alegación de culpabilidad. A su entender, dicha imputación era falsa, ya que los cargos en su contra habían sido desestimados con perjuicio.

Asimismo, el señor Cora Colón sostiene que GFR Media incurrió en una conducta negligente al omitir verificar los récords electrónicos del proceso federal, en los que, como afirma, surgía dicha desestimación. Por último, plantea que los foros recurridos erraron al no establecer hechos

sustentados por la prueba presentada en el juicio, así como al no acreditar el testimonio que vertió sobre las repercusiones que las publicaciones tuvieron en su salud emocional y reputación.

Pues bien, una lectura desapasionada del expediente que tenemos ante nuestra consideración revela que no le asiste la razón al señor Cora Colón. Nos explicamos.

Nótese que, en ninguna de las publicaciones aquí en controversia, se indicó, de manera expresa, que este último se declaró culpable. Su nombre únicamente se incluyó en un párrafo de contexto, en el que se enumeraron los acusados identificados en el proceso criminal, según la lista de la propia Fiscalía Federal.

Lista que esta última continuó utilizando íntegramente en múltiples mociones posteriores a la desestimación de los cargos en contra del señor Cora Colón, incluyendo una entrada que incluía su nombre en el título de una moción informativa relativa a la posición del gobierno respecto a las personas acusadas que se declararon culpables.

**Dicho ello, es un hecho innegablemente cierto que el señor Cora Colón figuró como uno de los acusados en el caso en cuestión. También es correcto que un grupo sustancial de personas en ese mismo proceso criminal ya se había declarado culpable al momento de la publicación de las notas periodísticas aquí en pugna.**

**Así pues, el único hecho incorrecto o impreciso que se incluyó en las tres (3) noticias en cuestión radica en la frase "el resto de los acusados". Si, en lugar de esa**

**expresión, las referidas notas hubiesen indicado que fueron once (11) los acusados que se declararon culpables, la totalidad de la información hubiese sido verdadera.**

Es decir, la única razón por la que se podría deducir que el señor Cora Colón se declaró culpable descansa en la imprecisión de la publicación de utilizar el sintagma "el resto" en vez de precisar la cantidad de once (11); lo que, a su vez, requiere que la audiencia conecte la oración "el resto de los acusados ya se declararon culpable" con una veintena de nombres enumerados en un párrafo más adelante en la noticia.[13] Ello, pues, de la publicación, no surge expresamente la expresión de que el señor Cora Colón, específica o particularmente, se declaró culpable.[14]

Asimismo, de la prueba desfilada en el juicio, no surge de que la periodista Cobián Rodríguez sabía que los cargos criminales contra el señor Cora Colón se habían desestimado antes de publicar las noticias en cuestión. De

---

[13] El mero hecho de que una publicación se pueda leer de una manera tal que conduzca a una inferencia difamatoria no significa que ésta sea la única interpretación razonable ni que quien la divulgó tenía la intención de generar tal implicación o, incluso, que supiese que la audiencia podría interpretar razonablemente tal implicación. De este modo, requerir a las personas que diseminen información garantizar la veracidad de todas las posibles inferencias que razonablemente se puedan derivar a partir de una publicación socavaría la discusión franca y abierta de los asuntos de interés público. *Saenz v. Playboy Enterprises, Inc.*, 841 F.2d 1309, 1318 (7mo Cir. 1988); *Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 487 (7mo Cir. 1986); *Guilford Transp. Industries, Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000); *Dodds v. American Broad. Co.*, 145 F.3d 1053, 1063-64 (9no Cir. 1998); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-1093 (4to Cir. 1993).

[14] A lo anterior, y, como mencionamos, se suma el hecho de que el expediente del caso criminal muestra numerosas entradas en las que la fiscalía federal incluyó al señor Cora Colón entre los acusados luego de la desestimación de los cargos en su contra, incluyendo una en la que su nombre figura en una lista relativa a acusados que se declararan culpables en el título de la moción.

hecho, ésta testificó que no conocía el error en las publicaciones antes de que iniciara el presente pleito.[15]

**Además, debemos tener en cuenta que el dato de que los cargos en contra del señor Cora Colón se habían desestimado surge del título de tan sólo dos (2) ítems de un expediente electrónico que supera las mil cien (1,100) entradas, de modo que tal información constaba en tan sólo el 0.001% de los títulos del legajo cuyo acceso, dicho sea de paso, se cobra a base de la cantidad de páginas que se deseen visualizar o descargar.**

<u>**A la luz de lo anterior, no podemos avalar la conclusión de derecho del Tribunal de Primera Instancia de que la defensa del "informe justo y verdadero" no aplica al caso de marras. Como explicamos, esa defensa protege, incluso, a quien publica información falsa o difamatoria, siempre que lo publicado sea un reflejo sustancial de lo acontecido en el procedimiento judicial reseñado.**</u> *Villanueva v. Hernández Class*, *supra*, págs. 647-648; *Meléndez Vega v. El Vocero de PR*, *supra*, págs. 201.

Como hemos podido apreciar, en lo que respecta a la causa de epígrafe, las tres (3) notas periodísticas reportaron, en su esencia, lo que sucedía en el caso *USA v. Prestol Rodríguez y otros*, *supra*, a saber: (1) que una veintena de personas habían sido acusadas conjuntamente; (2) que varios coacusados ya habían hecho alegación de culpabilidad; y (3) se discutía el desenlace de los pocos

---

[15] *Transcripción*, Apéndice del *Certiorari*, pág. 1471.

casos pendientes, particularmente, el de la señora Benabe González y el del señor Solís Guzmán.

Asimismo, el hecho de que el desarrollo novedoso que motivaba cada nota no estuviese directamente vinculado con el señor Cora Colón, sino con otros acusados, no priva a las publicaciones de su carácter de reporte justo y verdadero, máxime cuando su nombre seguía figurando en la lista de acusados que la fiscalía federal incluía en sus mociones, incluso tras la desestimación de los cargos.

**Tampoco se ha probado aquí, conforme lo exige nuestro ordenamiento jurídico, que la periodista Cobián Rodríguez incurriera en negligencia al divulgar las publicaciones aquí en controversia. Ello, pues, a nuestro juicio, tal conclusión no se sustenta al considerar la importancia e interés público de la información publicada; el origen y la confiabilidad de ésta, -- a saber, una interpretación razonable de las constancias del expediente electrónico, incluyendo los títulos de las mociones de la Fiscalía Federal --, así como el costo, tiempo y personal que se hubiese requerido para corroborar, a la luz de la totalidad del legajo compuesto por miles de entradas, las incidencias procesales específicas para cada uno de los nombres incluidos en el párrafo de contexto en cuestión.**

**Asimismo, y, ante esas circunstancias, no podemos concluir que haya sido evidente que el señor Cora Colón no formaba parte de ese grupo que se declaró culpable y que, en consecuencia, estuviese presente el riesgo de que el público promedio sería inducido a interpretar un hecho**

**erróneo. Tal error, aunque desafortunado, no alcanza el grado de negligencia requerido para conceder daños por difamación, especialmente ante las protecciones constitucionales que aquí se activan debido a que lo publicado versa sobre asuntos de interés público.**

**Sobre este extremo, más preocupante aún resulta la novel imposición que hoy adopta la *Opinión* del Tribunal, según la cual el medio de comunicación tenía el deber afirmativo de monitorear, de manera continua, el expediente electrónico del caso federal, so pena de que la permanencia de una imputación inadvertidamente falsa, -- bajo una teoría de que "razonablemente lo debió conocer" --, agravase su situación jurídica.** Tal proceder, contrario a lo expresado por una mayoría de este Tribunal, no se desprende de nuestro acervo jurisprudencial. Por el contrario, contradice la norma de publicación única e impone un estándar tan oneroso que resulta prácticamente inalcanzable para cualquier medio que mantenga archivos digitales, los cuales suelen comprender miles, e, incluso, cientos de miles de publicaciones a lo largo de muchos años, incluso décadas.

La consecuencia inevitable de tal exigencia es el indeseado efecto disuasivo (*chilling effect*) sobre la libertad de prensa, repetidamente prohibido por la Primera Enmienda de la Constitución federal, *supra*. *Meléndez Vega v. El Vocero de PR*, *supra*, pág. 205; *Pérez v. El Vocero de P.R.*, *supra*, pág. 442; *Philadelphia Newspapers, Inc. v. Hepps*, *supra*, pág. 777; *Hustler Magazine, Inc. v. Falwell*,

485 U.S. 46, 52 (1988); *Garrison v. State of La.*, 379 U.S. 64, 74-75 (1964). En casos como el de autos, ningún foro estatal puede permitir la imposición de responsabilidad civil sin negligencia realmente probada, mucho menos a base de un deber de verificación absoluta que ningún medio podría razonablemente cumplir.

B.

Ahora bien, no empece a lo anterior, incluso si la defensa de reporte justo y verdadero resultase inaplicable, -- cosa que ya aquí descartamos --, la presente reclamación adolece de otra falla vital. **Ante una ausencia de prueba creíble o admisible de los daños realmente sufridos, la causa de acción por difamación se torna improcedente, toda vez que queda infundada respecto a uno de sus elementos esenciales.** En escenarios como el antes descrito, indudablemente, corresponde la desestimación de la demanda.

En lo que respecta a la causa de epígrafe, es de notar, primeramente, que la prueba de cada uno de los elementos de una causa de acción por difamación, -- incluidos los daños realmente sufridos --, debe satisfacer el *quantum* probatorio de evidencia clara, robusta y convincente. *Colón, Ramírez v. Televicentro de P.R.*, *supra*, pág. 725; *Clavell v. El Vocero de P.R.*, *supra*. Como ya explicamos, dicho estándar elevado responde a una exigencia del debido proceso de ley, dado que se trata, precisamente, del balance entre derechos fundamentales en pugna. *Íd.* Por ello, resulta insuficiente que la parte demandante prevalezca mediante una mera preponderancia de la prueba,

por lo que, para vencer las protecciones constitucionales que cobijan a la prensa, dicha parte debe hacer una demostración robusta, clara y convincente de cada uno de los elementos de su reclamación.

**Apartarse de ese estándar, -- como se hace en la *Opinión* del Tribunal--, bajo la equivocada premisa de que su adopción se debió a una alusión genérica que no está respaldada por la Ley de Calumnia y Libelo, *supra*, ni por otro estatuto --, supone una equivocación de mayúscula magnitud.** Ciertamente, una multitud de requisitos probatorios y elementos sustantivos de nuestro acervo jurídico sobre difamación, -- desde la propia clasificación tripartita de persona pública, persona privada en asunto de interés público y persona privada en asunto de mero interés privado, hasta los criterios para evaluar la negligencia y la malicia real --, no se encuentran en el cuerpo de la antigua Ley de Calumnia y Libelo, *supra*, ni en otra disposición estatutaria.

Por el contrario, dichos elementos se desprenden, principalmente, del desarrollo jurisprudencial federal y nuestro, en armonía con los preceptos constitucionales que rigen las libertades de palabra y prensa. Pretender derribar el referido estándar probatorio sólo porque éste no se encuentra recogido en una disposición estatutaria expresa supondría debilitar, sin justificación, una garantía diseñada para proteger un derecho fundamental.

**En segundo orden, y, como adelantamos, el foro primario, -- tras observar de manera directa a los testigos**

**y aquilatar la totalidad de la prueba ante sí --, expresamente determinó que la parte peticionaria no presentó prueba creíble sobre los daños emocionales y morales alegados ni produjo evidencia objetiva que avalara los daños a su reputación. Posteriormente, esa apreciación fue confirmada por el Tribunal de Apelaciones, tras una revisión cuidadosa del expediente.**

**Tales determinaciones, conforme expusimos, merecen una alta deferencia, salvo que medie un error claro, pasión, prejuicio o parcialidad.** *Rebollo López v. Gil Bonar*, *supra*, pág. 678; *Gómez Márquez et al. v. El Oriental*, *supra*, pág. 793; *Dávila Nieves v. Meléndez Marín*, *supra*, págs. 770-772. **Incluso cuando este Alto Foro esté obligado a realizar una evaluación independiente del expediente, -- como ocurre en los casos en que se requiere auscultar el estándar de malicia real --, la deferencia a las determinaciones de credibilidad se mantiene incólume, debido a que es el foro primario, precisamente, quien pudo juzgar el comportamiento o *demeanor* de los declarantes.** *Meléndez Vega v. El Vocero de PR*, *supra*, págs. 151-154; *Gómez Márquez et al. v. El Oriental*, *supra*, págs. 792-795; *Dávila Nieves v. Meléndez Marín*, *supra*, pág. 771.

No obstante, hoy, una mayoría de mis compañeras y compañeros de estrado opta por descartar, sin más, las determinaciones de los foros recurridos. En parte alguna del fallo, se articula una explicación adecuada de por qué la apreciación que hicieron, tanto el foro primario como el foro apelativo intermedio, del testimonio del señor Cora

Colón resultaba claramente errónea. Mucho menos se expone por qué procedía sustituir la evaluación de quien observó, presencialmente, el modo de declarar de los testigos, por la de un foro que sólo cuenta con un récord frío en papel. Tal proceder, lejos de honrar nuestra reiterada doctrina sobre la revisión apelativa, supone un retroceso que pone en entredicho la deferencia que decimos guardar.

C.

Por otra parte, y, como adelantamos, el testimonio del señor Cora Colón estuvo plagado de declaraciones de compañeros de trabajo, vecinos y familiares, ofrecidas, -- una y otra vez --, para evidenciar que estas terceras personas pensaron, equivocadamente, que éste se había declarado culpable de un delito a raíz de las noticias. Esas aseveraciones fueron objetadas, -- clara, específica y oportunamente --, en numerosas ocasiones, por la representación legal de GFR Media, debido a que constituían prueba de referencia inadmisible.[16]

Frente a esas objeciones, el foro primario dictaminó, correctamente, que sólo permitiría tales contestaciones a los únicos fines de facilitar la narración del testimonio del señor Cora Colón, pero que las mismas eran inadmisibles para probar la veracidad de la información, por constituir "clásica prueba de referencia".[17]

---

[16] Véase *Transcripción*, Apéndice del *Certiorari*, págs. 1207, 1219, 1227, 1257, 1260, 1263-1265, 1287.

[17] *Transcripción*, Apéndice del *Certiorari*, pág. 1288.

**Realizado lo anterior, todo intento de basar los alegados daños del señor Cora Colón en las declaraciones de terceras personas, -- traídas al juicio en voz del propio demandante --, choca, frontalmente, con la regla general de exclusión de prueba de referencia contemplada en las Reglas 801 y 804 de Evidencia,** *supra***.**

La *Opinión* del Tribunal, sin embargo, no asume las consecuencias jurídicas de esa exclusión. En su lugar, descansa parte sustancial de su análisis en lo que el señor Cora Colón dice que terceras personas le dijeron, lo que constituye evidencia que, por mandato expreso del foro primario, no podía utilizarse para probar la veracidad de lo aseverado. Conviene recordar aquí que la mencionada regla de exclusión obedece, precisamente, a la falta de confiabilidad y al dudoso valor probatorio de este tipo de evidencia. *In re Ríos Ríos*, *supra*, págs. 75-76.

**Permitir que ésta sostenga, sin más, una causa de acción por difamación supone, en la práctica, vaciar de contenido la referida regla y, con ello, exponer a la prensa de este País a responder a base de testimonios ambiguos, descontextualizados o, incluso, estereotipados frente a quien acuda al tribunal alegando daños. Falla malamente una mayoría de este Tribunal al así permitirlo.**

D.

Por último, -- y, posiblemente, lo más grave del proceder mayoritario en este caso --, radica, como ya mencionamos, en su intento de eludir la prohibición constitucional federal sobre la presunción de daños

mediante el ingenioso, pero ineficaz, recurso de rebautizar como "inferencia razonable" lo que, en sustancia, no es otra cosa que una presunción legal. Como explicamos, una presunción legal es una regla de inferencia que controla o limita la discreción del juzgador en el aspecto central de deducir conclusiones a partir de la totalidad de la evidencia presentada.[18] Asimismo, conforme dispone la Regla 304 de Evidencia, *supra*, las presunciones legales pueden establecerse por ley o por decisiones judiciales.

**En consecuencia, cuando este Alto Foro, -- mediante el fallo mayoritario del que hoy disentimos --, dictamina que, probada la divulgación negligente de una información falsa, es permisible inferir que se han sufrido daños, está, en efecto, instaurando una presunción legal. El hecho de que la mayoría prefiera llamarla "inferencia razonable" no altera, en absoluto, su naturaleza jurídica.**

**Tal proceder, conforme hemos señalado, está vedado por las garantías mínimas de la Primera Enmienda de la Constitución de los Estados Unidos de América, *supra*. <u>En *Gertz v. Robert Welch, Inc.*, *supra*, según interpretado en *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, *supra*, el Tribunal Supremo federal resolvió, con meridiana claridad, que, en casos en los que la parte demandante sea una persona privada, pero la publicación verse sobre asuntos de interés público, los foros estatales no pueden permitir presumir los daños, salvo que se haya demostrado</u>**

---

[18] Véase E.L. Chiesa Aponte, *Compendio de evidencia (En el sistema adversarial)*, *op. cit.*, pág. 71.

**malicia real**. **Cualquier proceder en contrario socava las libertades de palabra y prensa, al permitir que se imponga responsabilidad civil ante una mera imprecisión o errata, sin que medie prueba de los perjuicios alegados.**

IV.

En definitiva, y, a modo de epílogo, aquí no se cometieron los errores señalados, por lo que no procedía intervenir con los dictámenes recurridos.

Sin embargo, lamentablemente, ese no fue el camino que decidió seguir una mayoría de mis compañeras y compañeros de estrado. En cambio, éstas y éstos optaron por retroceder esas garantías que se pensaban inamovibles en nuestro País. Decidieron esconderse detrás del manto negro del verdugo de la palabra abierta y de la denuncia franca.

Sabido es que, en nuestro Pueblo, como en muchos otros, surgen incidentes desafortunados de corrupción, abuso de poder, fraude y otras conductas antisociales. Durante los últimos años, hemos visto múltiples arrestos, -- tanto en la esfera gubernamental como en la privada --, precisamente, por esquemas como éstos.

Tales incidentes merecen ser investigados, divulgados, reseñados y comentados. No obstante, para que ello sea posible, resulta necesario que este Alto Foro cumpla con su función constitucional de proteger las garantías que se han diseñado con ese propósito.

**No se trata, pues, de dejar desprovistas de remedios a las personas que han sufrido daños injustos e infundados a su honra y reputación. Se trata de establecer un balance**

**adecuado para dejar un margen razonable para errar, pues ello es un efecto secundario inevitable, pero necesario, de una sociedad libre y democrática. Tal equilibrio, a nuestro juicio, no se logra debilitando las garantías existentes, sino reafirmando los principios que bien nos han servido en el pasado.**

Es, pues, por todas las razones antes expuestas, que disentimos del curso de acción seguido hoy por una mayoría de este Tribunal.


                                    Ángel Colón Pérez
                                    Juez Asociado